# FOR PUBLICATION



FILED
Oct 08 2013, 5:28 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**JULIANNE L. FOX**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CHRISTINE REDELMAN**
Deputy Attorney General
Indianapolis, Indiana

**ROBERT J. HENKE**
Office of the Indiana Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
N.Q., Je.Q., Ja.Q., L.Q., Minor Children, )
                                                          )
T.Q., Mother,  and A.Q., Father, )
                                                          )
         Appellants-Respondents, )
                                                           )
             vs.                                  )     No. 82A04-1301-JT-42
                                                            )
INDIANA DEPARTMENT OF CHILD )
SERVICES, )
                                                           )
         Appellee-Petitioner. )

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Renee Allen Ferguson, Magistrate
Cause Nos. 82D01-1205-JT-50, 82D01-1205-JT-51, 82D01-1205-JT-52, 82D01-1205-JT-53

**October 8, 2013**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

T.Q. ("Mother") and A.Q. ("Father," and collectively with Mother, "Parents") appeal the involuntary termination of their parental rights to their children, N.Q., Je.Q., Ja.Q., and L.Q. (collectively, the "Children"). Parents raise one issue, which we revise and restate as whether the evidence is sufficient to support the trial court's judgment terminating their parental rights. We reverse and remand.

## FACTS AND PROCEDURAL HISTORY

We begin by reciting the underlying facts as set out by this court in our memorandum decision in In re N.Q., No. 82A05-1109-JT-511 (Ind. Ct. App. May 16, 2012):

> On December 11, 2009, [the Indiana Department of Child Services ("DCS")] removed the Children[1] and two siblings from the Parents' home because of unsafe home conditions, medical issues, and lack of supervision, among other reasons, and placed them in foster care. On December 15, 2009, DCS filed petitions alleging that all six children were children in need of services ("CHINS"). The Parents denied the allegations, and the trial court held a factfinding hearing. On April 13, 2010, the trial court entered orders adjudicating all six children as CHINS.
>
> Indiana Code Section 31-34-19-1 provides that not more than thirty days after it finds that a child is a CHINS, the court must complete a dispositional hearing to consider, among other things, "[a]lternatives for the care, treatment, rehabilitation, or placement of the child" and "[t]he necessity, nature, and extent of the participation by a parent . . . in the program of care, treatment, or rehabilitation of the child." The trial court held a dispositional hearing on May 5, 2010, and the Children remained in foster care. The chronological case summaries indicate that the dispositional decrees were to be furnished to the trial court by DCS, but, apparently as a result of an oversight, the decrees were not filed until February 14, 2011, and were not entered in the court's order book until March 16, 2011. . . .

---

[1] Again, the Children include L.Q., a daughter born in 2006, Ja.Q., a son born in 2005, Je.Q., a daughter born in 2004, and N.Q., a daughter born in 2000.

2

Slip op. at 2-3. On December 14, 2010, or three months prior to the entry of the dispositional decrees, DCS filed petitions for the involuntary termination of the Parents' parental rights as to the Children, and a hearing on the petitions was held over the course of several days between January and April 2011. Id. at 3. On July 13, 2011, the trial court issued an order granting the termination petitions. Id.

On appeal, DCS conceded that "the Children had not been removed from the Parents for at least six months under a dispositional decree when the termination petitions were filed, as required by Indiana Code Section 31-35-2-4(b)(2)(A)(i),"[2] as well as "that it apparently failed to plead in its petitions that the alternative elements listed in subparagraph (A) had been satisfied." Id. at 6. We reversed the trial court's termination order and remanded for further proceedings, noting that "our conclusion 'should in no way be construed as a comment upon the sufficiency of the evidence relating to the remaining elements of the termination petition[s].'" Id. at 7 (quoting In re D.D., 962 N.E.2d 70, 75-76 (Ind. Ct. App. 2011)).

On May 16 and 17, 2012, DCS filed its second Petitions for Termination of Parental Rights for the Children, and on June 26, 2012, Parents appeared in court and denied the petitions. The court appointed counsel for Parents and set a hearing date of October 1, 2012, as well as a pretrial hearing date of September 18, 2012. The court held a pretrial hearing as scheduled.

---

[2] Ind. Code § 31-35-2-4(b) provides in part that "a petition to terminate parental rights must meet the following relevant requirements: (2) The petition must allege: (A) that one (1) of the following is true: (i) The child has been removed from the parent for at least six (6) months under a dispositional decree. . . ."

On October 1, 2012, as scheduled, the court held a termination hearing (the "Second Termination Hearing"). At the outset of the hearing, the court admitted, over the objection of Parents, the transcript and exhibits of the previous termination hearing as DCS Exhibits 1 and 2. The court then admitted another twenty-two exhibits into the record without objection, including documents related to the CHINS proceedings of the Children, certified pleadings, certified records from Southwest Behavioral Healthcare concerning the Children, certified records from Easter Seals Rehabilitation Center, and certified dockets concerning Mother and Father regarding 2010 criminal convictions for neglect of a dependent as class D felonies.

Mother was then called to the stand and testified that in November of 2011 she and Father moved into a two-bedroom apartment in which their eldest daughter, sixteen-year-old C.Q., currently resides with them.[3] Mother testified that C.Q. has made "[m]ost" of her appointments, noting that they were unable to make three but that those appointments were rescheduled and they "had gotten her in." Transcript at 20-21. Mother testified that she has not worked since 2005, noting that she has several health problems including fibromyalgia, asthma or COPD, anxiety, crushed cartilage in her left knee, mitosis and arthritis, and is legally deaf in one ear, as well as back issues including that her sciatic nerve and a muscle are protruding through her backbone. Mother testified that she does not currently receive disability but explained that "[a]s soon as [she] get[s] her] lawyer paid off for [Father's] disability" she can start receiving her own, and she noted that she needs to pay the attorney $100. Id. at 22. Mother testified that her family

---

[3] As of the October 1, 2012 hearing, C.Q. was a sophomore in high school.

is "current on all of [their] bills." Id. She also noted that the furniture in their home was donated.

Mother testified that they live in "Section 8" housing and that they currently pay $156 per month in rent. Id. at 24. She testified that they receive $1,019 per month from Father's Social Security Disability ("SSD"), and that C.Q. receives an additional $88 per month from SSD. Mother testified that they were able to pay $300 for C.Q. to participate in band and drama at school. Mother also testified that they routinely clean their apartment, including doing the dishes and sweeping the floors. She also stated that they have discussed moving into a house with their housing manager if the Children are returned to them, and were advised that it would not be a problem, noting that the manager would "just have to know they're coming for sure." Id. at 30. Mother also testified that they do not currently own a vehicle and would need to take the bus to the Children's appointments.

Father was next called as a witness and began by noting that he has a degenerate back disease for which he receives disability payments through SSD. He stated that he did not know if he would be able to work and that he "can't really lift anything at all." Id. at 32. Father testified that he possessed a driver's license and a chauffeur's license but that he could not imagine sitting in a car all day with his back trouble, noting that he has been receiving therapy and shots approximately every six weeks and that the shots have "really helped [] a lot." Id. at 44. Father also testified that the furniture they have was donated by their church but that they have "a lot of stuff in storage" as well, including tables and chairs. Id. at 34. He testified that he began receiving SSD on May

5

18, 2011, and that he received $10,000 in back disability payments and that he used "most . . . for back pay on our rent and other church members that helped us. Made sure we took care of everybody that helped us get through the rough times." Id. at 35. Father stated that although C.Q. has had some clothes donated to her, he and Mother "took her out on her birthday and bought her a complete western outfit," and that "whatever [C.Q.] might need us to do for her, we will." Id. at 36-37. He also noted that his mother visits two or three times a month and helps Parents buy groceries, and she would help with making appointments for C.Q. or the other Children if she were asked.

When asked to "tell the Court what you've done since the last trial date to be able to allow the younger kids to come home," Father replied:

> I didn't have any source of income for . . . since 2007. The first lawyer we went to he really didn't do the job that was required. Then we obtained another attorney and he got my disability. With the money that we got we paid back everybody that helped us when we were down. And right now we're in a nice place, a nice apartment, keep our bills current. We do keep a little bit extra back. We don't keep it in the bank. We keep it at the house for emergencies.

Id. at 41. He also noted that if the Children were to be returned to Parents his monthly SSD payment would increase which would enable Parents to be able to care for the Children. He also noted that in addition to his mother, his brother and the pastor of the church would be able to help out with looking at prospective houses.

Next, DCS called Debra Gamache, who had been acting as a CASA for the Children for about the past three months. Gamache testified that the Children were "doing very well" in their foster placement and noted that they have had "ups and downs." Id. at 46-47. She testified that all of the Children "have slight learning

6

disabilities" and that "the foster parents are doing an amazing job keeping up with all the therapy appointments . . . ." Id. at 47. Gamache recommended that the children "stay at the current foster placement and be free for adoption" and noted that her reasoning was that N.Q. "does not want to go back home" and that "[t]he little ones are also fearful of going home and they all want to stay where they are currently." Id. at 48. On cross examination, Gamache noted that the children had "not had contact with their parents . . . for quite a long time. There was an accidental meeting at Southwest in June . . . ." Id. at 50. She also noted that as far as she knew, C.Q. is "on an extended trial home visit" and that contact between C.Q. and the other Children had not occurred since February or April of 2011. Id. at 52.

Next, DCS called Paula Wilson, the family case manager since February of 2012. She testified at the outset that C.Q. "is doing well enough to stay" with Parents, that "she is just a really good kid" and "does not have behavior issues at school," and that she is "mature for her age" and is "able to take care of herself." Id. at 54, 56-57. Wilson also indicated that C.Q. had missed some of her appointments, and noted that some of them were rescheduled, but in particular C.Q. is behind on her dental appointment and "no showed for a Doctor Evans appointment of the nurse practitioner . . . at Southwestern." Id. at 59. Wilson testified that the Children have made improvements in school since living with the foster parents. On cross examination, Wilson testified that "lots of therapists and people . . . have to give their okay" before sibling visitation between C.Q. and the Children could occur because "they feel like [the Children] should be able to adjust to their situations without the influence of that sibling visit . . . ." Id. at 62.

7

The court concluded the hearing and asked the parties to submit proposed findings.[4] On January 8, 2013, the court issued its Findings of Fact and Conclusions of Law (the "Termination Order") terminating the parent-child relationship of Parents and the Children. To the extent necessary, specifics from the Termination Order will be discussed below.

## STANDARD OF REVIEW

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. In accordance with Ind. Code § 31-35-2-8(c), the trial court's judgment contains specific findings of fact and conclusions thereon. We therefore apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), reh'g denied, trans. denied; see also Bester, 839 N.E.2d at 147; In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (noting that this court will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made") (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). Thus, if the

---

[4] We observe that the transcript from this consists of seventy pages, sixty-three of which constitute a recitation of the proceedings below.

8

evidence and inferences support the trial court's decision, we must affirm. In re L.S., 717 N.E.2d at 208.

The involuntary termination of parental rights is the most extreme measure that a court can impose and is designated only as a last resort when all other reasonable efforts have failed. In re S.P.H., 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). This policy is in recognition of the Fourteenth Amendment to the United States Constitution which provides parents with the right to establish a home and raise children. Id. However, these protected parental rights are not absolute and must be subordinated to the children's interests to maintain the parent-child relationship. Id.; see also Egly, 592 N.E.2d at 1234 (noting that the "purpose of terminating parental rights is not to punish parents, but to protect the children") (citing Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 101 S. Ct. 2153 (1981), reh'g denied). Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

    (B)    that one (1) of the following is true:

        (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> > (ii)   There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> > (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)   that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).[5]   The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'"   In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)), reh'g denied.   "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship."   Ind. Code § 31-35-2-8(a) (emphasis added).

In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions.   In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied.   Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child.   Id.   The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, "but also those bases resulting in the continued placement outside the home."   In re A.I., 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), trans. denied.   A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of

---

[5]   We observe that Ind. Code § 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).  The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

neglect, failure to provide support, and lack of adequate housing and employment. McBride, 798 N.E.2d at 199. Moreover, a trial court "can reasonably consider the services offered by the [DCS] to the parent and the parent's response to those services." Id. In addition, "[w]here there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." In re A.H., 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). The burden for the DCS is to establish "only that there is a reasonable probability that the parent's behavior will not change." In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

## DISCUSSION

We begin by recognizing that at the Second Termination Hearing, DCS relied heavily upon the previous proceedings which were held a year-and-a-half earlier, between January and April of 2011. At the outset of the hearing, DCS admitted, over the objection of Parents, the transcript and the exhibits of the first termination proceedings. Indeed, the Second Termination Hearing was quite brief. As an example, the direct testimony of Gamache, the CASA, is recited on pages 46-48, a scant three pages, of the transcript. The direct testimony of Wilson, the family case manager, was a bit longer and is represented on pages 53-61 of the transcript. The entire hearing transcript is seventy pages long.

In its Termination Order, the court's findings focus primarily on the evidence presented at the first termination hearing, and it appears that the court may have used the initial termination order, prepared on July 1, 2011, and merely added a few new findings

to the end of the recitation of the findings of fact.[6]  This problem with the Termination Order is underscored by the fact that some of the specific findings contain facts which were *directly contradicted by Parents and not refuted by DCS* at the October 1, 2012 hearing.  For example, Finding 15 states:

> Despite not having the children in their care and not paying any support for [the Children] during the wardship, [Parents] are behind in their rent.  At the time of trial, they were $2500 behind in rent and had only paid $200.00 since October, 2010.  The plan is pay the rent up when [Father] receives his disability check.  The electric is also two months behind.

Appellant's Appendix at 73.  Also, Finding 20 states as follows:

> The plan of [Parents] to resolve their financial issues and meet the needs of their children is to get on disability.  Until then, the plan is to borrow from churches and their parents.  [Parents] have failed to qualify for social security on several attempts, but they are hopeful with their new social security attorney.

Id. at 74.

At the October 1, 2012 hearing, undisputed evidence was presented that Father had qualified for SSD and was receiving payments of $1019 per month, that C.Q. was receiving an additional $88 per month from Father's SSD, and that Father's SSD was approved in May 2011.  Parents also stated that they paid back those who had lent them money with the $10,000 Father received as part of his SSD back payments, and that they were current on their bill obligations.

Importantly, we observe that both Parents testified at the Second Termination Hearing that they have been keeping their current apartment clean, specifically noting that they were routinely doing the dishes and sweeping the floors.  Indeed, Parents' current living situation is such that it has been deemed adequate for C.Q. to reside with

---

[6] The July 1, 2011 order, or initial termination order, is not contained in the record.

12

them. DCS at the Second Termination Hearing did not present evidence refuting Parents' version of the current conditions that exist in their home, and the record does not reveal that DCS has investigated the living conditions since this court reversed the trial court's initial termination order. Nevertheless, in its Termination Order the trial court recited findings regarding the unsanitary nature of Parents' previous home based on the record from the initial termination hearing, and it failed to mention the uncontradicted testimony of Parents regarding the current sanitary conditions of the apartment. See id. at 72-75. This is despite the fact that the children were initially removed from Parents' care primarily due to the unsanitary conditions which existed at their home in December of 2009. See Exhibit 2.

Thus, our review of the record reveals that the trial court based its decision to terminate Parents' parental rights to the Children almost entirely on the evidence presented at the initial termination proceedings which occurred between January and April of 2011, and it did not adequately account for the current conditions as required. On this score, we reiterate that this court *reversed* the trial court's initial termination order because DCS failed to comply with the dictates of Ind. Code § 31-35-2-4(b)(2)(A)(i). Specifically DCS did not file its petitions for termination at least six months following the entry of a dispositional decree – in fact, the dispositional decrees in this case were not filed until March 16, 2010, which was over three months *following* DCS's petitions for termination.

Regarding the importance of a dispositional decree,[7] we observe that the Indiana Supreme Court has stated that dispositional decrees are "one of many steps in the continuing procedural scheme for the care and protection of the children with the ultimate

---

[7] We observe that Ind. Code § 31-34-20-1, titled "Entry of dispositional decrees; removal of child . . . ," provides:

    (a)    Subject to this section and section 1.5 of this chapter, if a child is a child in need of services, the juvenile court may enter one (1) or more of the following dispositional decrees:

        (1)    Order supervision of the child by the department.

        (2)    Order the child to receive outpatient treatment:

            (A)    at a social service agency or a psychological, a psychiatric, a medical, or an educational facility; or

            (B)    from an individual practitioner.

        (3)    Remove the child from the child's home and authorize the department to place the child in another home or shelter care facility. Placement under this subdivision includes authorization to control and discipline the child.

        (4)    Award wardship of the child to the department for supervision, care, and placement.

        (5)    Partially or completely emancipate the child under section 6 of this chapter.

        (6)    Order the child's parent, guardian, or custodian to complete services recommended by the department and approved by the court under IC 31-34-16, IC 31-34-18, and IC 31-34-19.

        (7)    Order a person who is a party to refrain from direct or indirect contact with the child.

        (8)    Order a perpetrator of child abuse or neglect to refrain from returning to the child's residence.

We also note that "[t]his Court has previously explained that '[f]or purposes of the element of the involuntary termination statute requiring a child to have been removed from the parent for at least six months under a dispositional decree before termination may occur . . . such a dispositional decree is one that authorizes an out-of-home placement.'" In re D.D., 962 N.E.2d at 75 (internal quotations omitted) (quoting A.P. v. Porter Cnty. Office of Family & Children, 734 N.E.2d 1107, 1116 (Ind. Ct. App. 2000), reh'g denied, trans. denied).

result of either returning them to their home or terminating the parental rights." Matter of Robinson, 538 N.E.2d 1385, 1387 (Ind. 1989). Dispositional hearings, and the orders which result therefrom, are used to set "a program to be pursued that will ultimately result in a final disposition of the cause." Id. The Court in Matter of Robinson noted in that:

> It was clearly established at that hearing that the children were wards of the Welfare Department in foster home care, that they were to remain so, and that the father was to be advised of the participation program already established in 1982 and given an opportunity to take part in it. That program required the father to visit his children, participate in counseling, establish himself in regular employment and pay a small amount of support money for the care of his children. The Welfare Department further stated that, as part of their program, if Robinson did not participate and rehabilitate himself they would subsequently move to terminate his parental rights. The judge explained to Robinson the provisions of the program, the dispositional order the court was about to enter, and asked him if he understood his obligations. Robinson stated he understood them and intended to take part in the program.

Id.; see also Parent-Child Relationship of L.B. and S.B. v. Morgan Cnty. Dep't of Pub. Welfare, 616 N.E.2d 406, 408 (Ind. Ct. App. 1993) (Conover, J., dissenting) (citations omitted) (citing Matter of Robinson, 538 N.E.2d at 1387) ("Within the six month period from the time of the dispositional decree until the welfare department files its termination petition with the court, the parent is given time in which to participate in the program set up by the welfare department designed to enable the parent to show he was willing and able to reassume the role of parent to the children. The welfare department is to advise the parent it would move to terminate parental rights if the parent fails to comply with the participation program."), trans. denied.

Here, Parents were without the direction of a dispositional decree prior to DCS's initial petitions for termination; this violation resulted in the reversal of the court's initial termination order as fundamental error. N.Q., slip op. at 2. It is therefore troubling that DCS would then, at the Second Termination Hearing, rely almost entirely upon the transcript and exhibits from this hearing to prove that, as of October 1, 2012, Parents parental rights to the Children should be terminated. The timing requirements provided by Ind. Code § 31-35-2-4(b)(2)(A) are in place for a reason, namely, to insure that parents have an adequate opportunity to make the corrections necessary in order to keep their family unit intact. It would be bad policy to condone what occurred at the Second Termination Hearing, and it was error for the trial court to base its Termination Order primarily upon the evidence presented at the initial termination hearing.[8]

Moreover, it was error for the court to issue its order which did not adequately consider the evidence presented by Parents of their current conditions, including Parents' new income and their ability to keep current on their bills and maintain a clean residence. Indeed, the court also failed to consider the lack of evidence to the contrary presented by DCS, despite the fact that it was DCS's burden to prove its case by a heightened "clear and convincing" standard. In re G.Y., 904 N.E.2d at 1260-1261. Our review of the record reveals that the crux of DCS's presentation of evidence at the Second Termination Hearing was that the Children, who were ages six, seven, eight, and twelve at the time,

---

[8] While we acknowledge the statement of Indiana law that "even a complete failure to provide services would not serve to negate a necessary element of the termination statute and require reversal," In re E.E., 736 N.E.2d 791, 796 (Ind. Ct. App. 2000), we find that the lack of a dispositional decree on the record prior to DCS's filing of petitions for termination taints the proceedings held between January and April of 2011, and while we do not today hold that a record of such proceedings was inadmissible, we believe that the extent to which they were relied upon by DCS and the court is problematic at best.

did not want to leave their foster parents and be returned to Parents' care. Also, the court's lack of consideration of the evidence presented at the Second Termination Hearing is underscored by the fact that some of its findings which, although perhaps were correct findings of the conditions present on July 1, 2011, were directly contradictory to evidence presented by Parents and which DCS failed to refute in October 2012.

Although DCS demonstrated that the Children are thriving in a loving, pre-adoptive foster home, "a parent's constitutional right to raise his or her own child may not be terminated solely because there is a better home available for the child." In re D.B., 942 N.E.2d 867, 875 (Ind. Ct. App. 2011) (citing In re K.S., 750 N.E.2d 832, 836 (Ind. Ct. App. 2001)). Recognizing that the involuntary termination of parental rights is the most extreme measure that a court can impose and is only designated as a last resort when all other reasonable efforts have failed, In re A.I., 825 N.E.2d at 805, and in light of the fact that DCS chose to rely primarily on the initial termination proceedings which occurred a year-and-a-half prior to the October 1, 2012 Second Termination Hearing, that the Parents' presented evidence that their current situation had changed significantly, and especially that DCS did not investigate the Parents' current situation leading up to the Second Termination Hearing but chose rather to rely upon circumstances, some of which were over two years old, we conclude that the court committed clear error in terminating Parents' parental rights to the Children. We reverse and remand for a hearing which fully considers the Parents' current circumstances as well as their habitual patterns of conduct to the extent that such patterns exist.[9]

---

[9] We note that this case is unlike the situation in which this court reverses and remands with instructions to enter additional findings to support the judgment in accordance with Ind. Code § 31-35-2-

17

CONCLUSION

For the foregoing reasons, we reverse the trial court's order terminating the parent-child relationship between Parents and the Children, and we remand for proceedings consistent with this opinion.

Reversed and remanded.

NAJAM, J., and MATHIAS, J., concur.

---

4(b). See, e.g., In re J.Q., 836 N.E.2d 961, 967 (Ind. Ct. App. 2005) (concluding that trial court's judgment failed to adequately state its reasons for its disposition thereby necessitating reversal with instructions to "carefully follow the language and logic laid out by our legislature" in the CHINS and termination statutes), reh'g denied. In such a case, DCS is not required to reinitiate termination proceedings as there was no error with the proceedings themselves – rather, it is for the court to merely enter findings based on the initial proceedings complying with the statute. Here, by contrast, we held in N.Q. that DCS "failed to prove removal according to the mandates of [Indiana Code Section] 31-35-2-4(b)(2)(A)" and we remanded "*for further proceedings* consistent with this opinion." Slip op. at 7 (emphasis added).

We acknowledge that this court's reversal in N.Q. was technical in nature, and we expressly noted that "our conclusion should in no way be construed as a comment upon the sufficiency of the evidence relating to the remaining elements of the termination petition." Id. (internal quotations omitted). However, regardless of *how* Parents were given a "second bite at the apple" to refute DCS's petition to terminate their parent-child relationship with the Children, the court was required to consider any changes in Parents' circumstances at the time of the termination hearing, on October 1, 2012, which might support preserving the parent-child relationship. Indeed, assuming that DCS pushes forward with termination proceedings, Parents will receive a rare "third bite," and the court shall consider the conditions as they exist at that time.