## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
Jul 01 2015, 8:46 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT
MOTHER

Erin L. Berger
Evansville, Indiana

ATTORNEY FOR APPELLANT
FATHER

Thomas G. Krochta
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of Je.Q., L.Q., Ja.Q., and N.Q., Children,

 and

T.Q. (Mother) & A.Q. (Father)

*Appellants-Repondents,*

   v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

July 1, 2015

Court of Appeals Case No.
82A01-1411-JT-504

Appeal from the Vanderburgh Superior Court.
The Honorable Mary Margaret Lloyd, Special Judge.
Cause Nos. 82D01-1403-JT-36
    82D01-1403-JT-37
    82D01-1403-JT-38
    82D01-1403-JT-39

**Baker, Judge.**

[1] T.Q. (Mother) and A.Q. (Father) appeal the juvenile court's order terminating the parent-child relationship between Mother, Father, and their four youngest children. This is the third appeal involving this case, and the parents argue that the statutory clock should have been reset after the second appeal. We disagree, and affirm.

# Facts

[2] Mother and Father are the parents of four children under the age of eighteen: N.Q. Je.Q., Ja.Q., and L.Q. Mother and Father also have two children over the age of eighteen who are not subject to this appeal.

[3] Mother and Father have a lengthy history with DCS. Beginning in 2007, DCS has substantiated four separate allegations of child abuse and neglect against the parents: (1) in 2007, DCS substantiated a report of educational neglect; (2) in 2008, DCS substantiated reports of physical abuse and poor home conditions; (3) in 2009, DCS substantiated reports of educational and medical neglect; and (4) in 2011, DCS substantiated a report of sexual abuse.

[4] On December 1, 2009, law enforcement was called to the parents' home to assist medical providers who had been treating Father. Law enforcement observed unsanitary home conditions, including animal feces on the floor, overflowing ashtrays, and rotting food. DCS was called to the home, found the

condition of the home to be "marginal," and gave the parents over a week to clean up the residence. Appellants' App. p. 87.

[5] On December 11, 2009, DCS returned to the residence to find that the conditions had not been remedied. DCS found trash throughout the home, sticky and dirty floors, overflowing ashtrays, rotting food, an overflowing litterbox, black toilets, clogged sinks, filthy and unsanitary showers, exposed metal springs in A.Q., Jr.'s[1] bed, and multiple mattresses in other rooms that were piled with dirt and trash. Additionally, both parents tested positive for THC, two of the children had significant unexcused school absences, parents had failed to provide recommended psychiatric and medical care for A.Q., Jr., none of the children were current with immunizations, and all of the children had significant dental problems and head lice. DCS also learned of an allegation that N.Q. had been sexually abused by A.Q., Jr.[2]

[6] As a result of the myriad issues outlined above, DCS removed the children from Mother and Father's care and custody on December 11, 2009. DCS placed the children in foster care and, on December 15, 2009, filed a petition in the trial court alleging that they were children in need of services (CHINS). On April

---

[1] A.Q., Jr., was a minor at the time the CHINS petitions were filed, but has since turned eighteen and is not part of this appeal.

[2] Eventually, both parents were convicted of multiple counts of felony child neglect as a result of the conditions of the children and the home.

30, 2010, following a hearing, the trial court entered orders finding all children to be CHINS.

[7] The trial court held a dispositional hearing on May 5, 2010. On December 14, 2010, DCS filed petitions for involuntary termination of Mother and Father's parental rights as to the children. However, the trial court did not issue dispositional decrees until February 14, 2011. On July 13, 2011, the trial court granted DCS's petitions as to each child, terminating Mother and Father's parental rights.

[8] However, on May 16, 2012, this Court reversed that decision. *In re N.Q.*, No. 82A05-1109-JT-511, 2012 WL 1744399, (Ind. Ct. App. May 16, 2012). We noted that, as the dispositional decrees were actually issued three months *after* DCS had petitioned for termination of parental rights, "the Children had not been removed from the Parents for at least six months under a dispositional decree when the termination petitions were filed, as required by Indiana Code section 31-35-2-4(b)(2)(A)(i)." *Id.* at *3. We remanded the case for further proceedings.

[9] On May 16 and 17, 2012, DCS filed its second round of petitions to terminate Mother and Father's parental rights as to the children. At the second termination hearing, DCS admitted, over the objection of the parents, the transcript and exhibits from the first termination proceedings. The additional evidence presented by DCS at the second termination hearing was "quite brief." *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). The juvenile court

granted the second termination petitions and the parents appealed. This Court reversed, emphasizing that "the trial court based its decision to terminate Parents' parental rights to the Children almost entirely on the evidence presented at the initial termination proceedings which occurred between January and April of 2011, and it did not adequately account for the current conditions as required." *Id.* at 393. In reversing and remanding, we held as follows:

> it was error for the court to issue its order which did not adequately consider the evidence presented by Parents of their current conditions, including Parents' new income and their ability to keep current on their bills and maintain a clean residence. Indeed, the court also failed to consider the lack of evidence to the contrary presented by DCS, despite the fact that it was DCS's burden to prove its case by a heightened "clear and convincing" standard. Our review of the record reveals that the crux of DCS's presentation of evidence at the Second Termination Hearing was that the Children, who were ages six, seven, eight, and twelve at the time, did not want to leave their foster parents and be returned to Parents' care. Also, the court's lack of consideration of the evidence presented at the Second Termination Hearing is underscored by the fact that some of its findings which, although perhaps were correct findings of the conditions present on July 1, 2011, were directly contradictory to evidence presented by Parents and which DCS failed to refute in October 2012.

*Id.* at 395 (internal citation omitted).

[10] On March 27, 2014, DCS filed a third set of petitions seeking to terminate the parent-child relationship. The juvenile court held termination hearings on June

25, July 25, August 1, and August 20, 2014.[3]  At these hearings, the following evidence was admitted:

- Mother was unemployed and had been for many years.  She has multiple health issues but does not receive any Social Security disability payments.  Tr. p. 8, 9-18.
- Father is unemployed and receives approximately $1,000 per month in disability payments.  The family's only additional income is $250 per month in food stamps.  *Id.* at 89, 102; Appellants' App. p. 90.
- At the time of the hearings, the parents were living in a two-bedroom apartment.  A.Q., Jr., who had sexually molested his sister, N.Q., when she was still in the home, was living there as well. Tr. p. 27-28, 38.
- C.Q., who lived with her parents until she turned eighteen, was completing community service hours following allegations of marijuana possession.  *Id.* at 26.  At the time of the hearing, she was eighteen, pregnant, and living with her boyfriend and his family.  *Id.* at 181, 183.  She had not completed high school, had not been getting prenatal care, and had already missed six of the first eight days of school.  *Id.* at 368.
- The parents had $5 in their savings account.  *Id.* at 63.
- Father had signed consents for the youngest three children to be adopted by their foster family because he believed that would be best for them.  He did not believe the parents had sufficient income to meet the children's needs.  *Id.* at 132.
- Since this Court issued its decision in *N.Q.* on October 8, 2013, the parents have refused to permit DCS case workers to enter their home on five occasions.  They have also refused to schedule appointments with DCS caseworkers, speak on the phone with DCS caseworkers, or in any way communicate with DCS caseworkers in a substantive way.  *Id.* at 168, 169, 171, 172, 176, 299.

---

[3] At some point, Special Judge Lloyd was appointed to hear this case.  The record does not reveal the precise date on which this occurred, but Judge Lloyd was in place when the third termination petitions were filed in March 2014.

- The parents have not seen the children since 2011. Since that time, the parents have not inquired as to the children's well-being, and except for one occasion when Mother requested to see N.Q. in her residential placement, the parents have not asked to visit with the children since 2011. *Id.* at 164-65, 176.

On October 22, 2014, the juvenile court entered an order terminating the parent-child relationship between Mother, Father, and the four children. The parents now appeal.

# Discussion and Decision

# I. Standard of Review

Our standard of review with respect to termination of parental rights proceedings is well established. In considering whether termination was appropriate, we neither reweigh the evidence nor assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We will consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's opportunity to judge witness credibility firsthand. *Id.* Where, as here, the trial court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous. *Id.* In making that determination, we must consider whether the evidence clearly and convincingly supports the findings, and the findings clearly and convincingly support the judgment. *Id.* at 1229-30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by

the respondent parent's custody." *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005).

[13] Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

> (A) that one (1) of the following is true:
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1230.

## II.  Duration of Removal

Parents' primary argument on appeal is that the children had not been removed from parents' care and custody for a sufficient period of time pursuant to the statute.  They acknowledge that the statute requires that the children must have been removed from parents' care for six months under a dispositional decree. I.C. § 31-35-2-4(b)(2).

Parents argue, with no citation to supporting authority, that "[w]here a termination is overturned on appeal, especially where a termination is overturned twice, the time period set out in the statute should be reset to give the parents the opportunity to meet DCS requests and get their children home." Appellants' Br. p. 8.  In other words, the parents contend that following the second reversal of the termination order by this Court in *N.Q.*, DCS should have had to wait *another* six months before again seeking termination.[4]

We cannot agree with this assertion.  The statute contains no caveats, exceptions, or addenda in any way altering the requirements for cases in which successive termination petitions are filed.  Instead, the statute is quite plain in its requirement that DCS need prove only that the child "has been removed

---

[4] DCS waited five months and seventeen days following *N.Q.* before filing the third termination petitions.

from the parent for at least six (6) months under a dispositional decree."
I.C. § 31-35-2-4(b)(2)(A)(i). We decline the parents' invitation to read words
into the statute that are not already there.

[17]  It is undisputed that in this case, the children have been removed from parents'
care and custody since the dispositional decree was issued in February 2011—
over *three years* before the third termination petitions were filed. Consequently,
we find that the juvenile court did not err in concluding that DCS met its
burden to prove with clear and convincing evidence that the children had been
removed from parents for at least six months pursuant to a dispositional decree.

[18]  The parents also make a somewhat undeveloped argument that, following the
second appeal in this case, DCS should have offered services to the parents,
scheduled a child and family team meeting, and viewed the condition of the
parents' home.[5] Initially, we note that it is well established that "a failure to
provide services does not serve as a basis on which to directly attack a
termination order as contrary to law." *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind.
Ct. App. 2009). Furthermore, there is evidence in the record establishing that
the parents refused to permit DCS caseworkers to enter their home or otherwise
talk to them on October 8, 2013, December 23, 2013, February 21, 2014,

---

[5] The parents argue that the second termination was reversed because DCS had "fail[ed] to provide services to the family following the first termination being overturned." Appellants' Br. p. 8. This is untrue. This Court reversed the second termination order because DCS had not presented evidence beyond that presented at the first termination hearing. Therefore, there was insufficient evidence regarding the current conditions that existed in the parents' lives at the time of the second termination hearing. *In re N.Q.*, 996 N.E.2d at 393-94. That deficit was corrected by DCS during the third termination hearing.

February 24, 2014, and March 4, 2014. On October 18, 2013, and March 11, 2014, the parents refused to speak with the caseworker on the phone or allow her to come to their residence. On April 8 and April 23, 2014, the caseworker saw the parents at court and asked them to schedule a meeting with her. They refused. Parents never called their DCS caseworker despite being provided with her phone number on multiple occasions. In other words, the record is replete with evidence that it was the parents' refusal to cooperate with DCS that led to the lack of contact and DCS's inability to view their home. Under these circumstances, we find no error in the juvenile court's order terminating the parent-child relationship.

The judgment of the juvenile court is affirmed.

Najam, J., and Friedlander, J., concur.