## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 25 2020, 8:46 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Catherine Brizzi
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of T.H. (Minor Child), and<br><br>L.H. (Father),<br><br>*Appellant-Respondent*,<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner*. | August 25, 2020<br><br>Court of Appeals Case No. 20A-JT-710<br><br>Appeal from the Floyd Circuit Court<br><br>The Honorable J. Terrence Cody, Judge<br><br>Trial Court Cause No. 22C01-1908-JT-477 |

**Brown, Judge.**

[1] L.H. ("Father") appeals the involuntary termination of his parental rights to his child, T.H. We affirm.

### Facts and Procedural History

[2] C.H. ("Mother") gave birth to A.K. on April 16, 2010, to S.K. on October 22, 2013, and to B.H. on February 17, 2015.[1] In 2015, the Indiana Department of Child Services ("DCS") filed a petition alleging that Father had burned S.K. and that the children were in need of services.[2] On January 10, 2017, T.H. was born to Mother and Father.

[3] On March 9, 2017, DCS filed a verified petition alleging T.H. to be a child in need of services ("CHINS"). DCS alleged that it received a report on March 8, 2017, that T.H. was a victim of neglect and that Mother stated she was overwhelmed, depressed, had not eaten in three days, had suicidal thoughts, and was trying to find someone to watch the child so she could be admitted to Wellstone. DCS claimed Father was T.H.'s father but that paternity had not been established and his address was unknown. On March 9, 2017, the court

---

[1] Father is not the father of these children. The court held a consolidated termination hearing regarding the termination of Father's parental rights to T.H. under cause number 22C01-1908-JT-477, Mother's parental rights to A.K. under cause number 22C01-1908-JT-478, Mother's parental rights to S.K. under cause number 22C01-1908-JT-479, and Br.H.'s parental rights to B.H. under cause number 22C01-1908-JT-480.

[2] Family Case Manager Brieanna Magerl testified that DCS discovered Father "was the person who perpetrated that physical abuse by dipping [S.K.'s] hand in some sort of boiling water," and "[w]e had clear and – more than clear and convincing evidence and testimonies that witnessed this incident that led to the substantiation of physical abuse." Transcript Volume II at 171. Father testified he was never charged with a crime in relation to the incident.

entered an Emergency Custody Order authorizing DCS to take T.H. into protective custody.

[4] On March 13, 2017, Mother entered an admission. On April 6, 2017, the court entered an order adjudicating T.H. as a CHINS. At some point during the CHINS case, a DNA test revealed Father was T.H.'s father, and he entered the case in March 2018.[3] The court held a factfinding hearing on June 8, 2018, and a dispositional hearing on July 12, 2018. Father did not attend these hearings and was on vacation in Florida.

[5] On August 14, 2018, the court entered an order noting that Father had not appeared for the hearing and adjudicating T.H. to be a CHINS. On August 20, 2018, the court entered a dispositional order which required Father to contact the family case manager every week, notify the family case manager of any changes in address, maintain suitable, safe, and stable housing, secure and maintain a legal and stable source of income, refrain from using any illegal controlled substances, complete a parenting assessment and all recommendations developed as a result of the assessment, submit to random drug screens, and attend all scheduled visitations.

[6] On August 1, 2019, DCS filed a verified petition for the involuntary termination of the parent-child relationship. On August 12, 2019, the court

---

[3] When asked whether he was "at all involved in [T.H.'s] life before those DNA results came back," Father answered: "No." Transcript Volume III at 173.

held a hearing, Father appeared, and the court entered a denial on his behalf and appointed a public defender to represent him.

[7] On January 30 and February 3, 2020, the court held a factfinding hearing. DCS presented the testimony of Mother; Debbie Mefford, the director of Floyd County CASA; Family Case Manager Brieanna Magerl ("FCM Magerl"); and Court Appointed Special Advocate Cathy Higgins ("CASA Higgins"). Father testified that he has another biological child, Z.W., whom he sees "[a]t least once every eight months." Transcript Volume III at 144. He stated that he started using marijuana to control his seizures and is allergic to antipsychotics, depressants, and anticonvulsants. He testified that he had a prescription for medical marijuana when he was living in Colorado Springs but would not disclose the identity of the person who prescribed it to him. He testified that he has a prescription for a medication but he did not know the name of the medication and has never taken it. With respect to T.H., he stated that he "missed some visits because off and on with the job sites" and had shingles. *Id.* at 159. When asked why he stopped visits with T.H., he answered: "I stopped going to visits because I felt discouraged." *Id.* at 174. On redirect examination, he testified that the last visit he missed prior to the visits being terminated was due to having shingles.

[8] On April 9, 2020, the court entered an order terminating Father's parental rights. The court found:

> 35. On January 10, 2018, Father began fatherhood engagement through Family Time.

36. On August 10, 2019, fatherhood engagement services were closed out due to Father's non-compliance and non-attendance.

37. On August 15, 2018, Father was referred for supervised visitation through Ireland Home Based Services.

38. On September 20, 2019, Father's referral with Ireland Home Based Services was closed due to non-compliance.

39. A second referral was made to Ireland Home Based Services for Father to begin supervised visitation.

40. Father's last visit with Child took place on October 18, 2019. Father has not sought reinstatement of his visitation.

41. Father has an untreated seizure disorder for which he does not take prescribed medication.

42. Father has consistently tested positive for THC throughout the pendency of the CHINS case.

43. Mother and Father have not been referred for unsupervised visitation throughout the entire pendency of the CHINS case.

44. Mother and Father have not provided for Child's physical care or sought placement of Child for the entire pendency of the CHINS case.

45. Mother and Father have not provided financial support for the Child since the CHINS case was opened on March 9, 2017.

46. Child has never returned to the care and custody of Mother or Father during the pendency of the CHINS case.

47. Child has been removed from the care and custody of Mother and Father since March 8, 2017, which represents the last 1,058 days.

* * * * *

49. Father has failed to fully complete any recommended services, including fatherhood engagement as well as a substance abuse assessment offered by DCS.

\* \* \* \* \*

51. Father was inconsistent in his supervised visitation.

52. Mother currently resides with a registered sex offender who is not the Child's father, which poses a danger to the Child if returned to Mother's home.

\* \* \* \* \*

54. From October 18, 2019 until present, Father made no efforts to visit with Child.

\* \* \* \* \*

58. DCS made reasonable efforts to finalize the former permanency plan of Reunification without Mother or Father making appropriate progress or indicating a willingness to reunify with their child.

\* \* \* \* \*

64. CASA Higgins noted Mother and Father's failure to complete recommended services since removal of the child, as well as Mother and Father's failure to fulfill their parental obligations and responsibilities as to Child, and the Child's strong, loving bond with [the] pre-adoptive foster parents.

\* \* \* \* \*

69. Mother and Father were unable and unwilling to provide for Child's reasonable needs throughout the pendency of the CHINS Case.

\* \* \* \* \*

71. Father stated his plan for care of the child, being that he has a room prepared for the Child's return. However, Father could not demonstrate his ability to effectively parent the Child.

Appellant's Appendix Volume II at 68-71. The court concluded there was a reasonable probability that the conditions resulting in the child's removal and continued placement outside the home would not be remedied, there was a reasonable probability that continuation of the parent-child relationship posed a threat to the well-being of the child, termination of the parent-child relationship was in the child's best interest, and there was a satisfactory plan for care and treatment of the child.

### *Discussion*

In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[10] A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence. Ind. Code § 31-37-14-2. We do not reweigh the evidence or determine the credibility of witnesses but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*. We give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. *Id*. "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640. The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B).

[11] Father argues that the trial court's findings rely on his historical failures and not on his ability to parent at the time of the termination hearing. Father points to Findings 36, 38, 40-46, 49, 51, 54, 58, 64, and 69, and asserts that none of them focus on his ability to parent T.H. at the time of the termination hearing. He also argues that the fact that T.H. is in a better home cannot form the basis for a termination.

[12]     In determining whether the conditions that resulted in a child's removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's drug abuse, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id.* Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[13]    To the extent Father does not challenge the court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[14]    FCM Magerl testified that Father "participated in fatherhood engagement through Family Time, but has not been consistent in doing that since about July of 2019, and then completely stopped engaging in October of 2019." Transcript Volume II at 126. When asked if he was currently engaged in any services, she answered in the negative. She testified he was required to complete approximately 100 drug screens, completed only twenty-four screens, and tested positive for THC twenty-one times. She stated Father participated in supervised visitation through Family Time but began canceling visits or failing to show and the referral was eventually closed in the beginning of 2019. She testified that visitation resumed through Ireland and Father missed about half of those visits. When asked why DCS had never been able to recommend unsupervised visits for Father, she answered: "He has not alleviated the safety concerns that led to DCS involvement in regards to him. He has not participated in the services required to alleviate those concerns." *Id.* at 132. She stated Father became "very combative verbally towards our fatherhood engagement worker, and then he stopped meeting with her." *Id.* at 163. She testified he moved several times during the prior year that she had the case, she had not had an address for him for the past five or six months, she did not have any information as to his current housing situation, and he informed her in

August 2019 that he was living with his mother in Louisville, Kentucky, but did not provide an exact address. When asked what concerns with Father had not been alleviated, she answered:

> There are the – the mental health concerns, the outbursts that have happened in front of the licensed professionals. But as far as the children go, other than the THC being a concern, there was an untreated seizure disorder and – as well as the reason for the children's removal in 2018, November of 2018 was – let me pull that up really quick because it does pertain to [Father]. We received a report in November of 2000 – sorry, I said '18, but '15 – November 17th of 2015, that [S.K.] had blisters on his hand and that it looked as though his hand had been burned.

> Upon further investigation, DCS did discover that – and through several interviews, DCS did discover that [Father] was the person who perpetrated that physical abuse by dipping [S.K.'s] hand in some sort of boiling water, whether it be in a cup or in a pot. But due to the markings and the markings of the burn being a straight line right above the wrist, it did indicate that the hand was held down because there were some splash burns. And we do receive training on that type of abuse. And that was something that was never discussed. Whenever I tried to discuss it with him, I did receive the response of "I didn't do that."

*Id.* at 170-171. She also testified: "We had clear and – more than clear and convincing evidence and testimonies that witnessed this incident that had led to the substantiation of physical abuse. And it was something that was denied over and over again once we tried to discuss it. And in this profession, if something – if we can't have a conversation about it, it can't be fixed." *Id.* at 171.

She testified Father had not remedied any of the conditions that led to T.H.'s removal. When asked why, she answered:

> I do know that he has been evicted within the past six months, so he does not have appropriate or stable housing. He's moved several times in the year that I've had the case. He consistently tests positive and does not comply with any treatment, though the referrals were there. And he has not visited with [T.H.] since October of 2019 in order to maintain that parent-and-child bond.

*Id.* at 136. When asked if she believed Father should be given more time to parent T.H., she answered in the negative.

[16] During cross-examination, DCS's counsel asked Father: "And currently, to this date, you're not engaging in any services. Is that correct to say?" Transcript Volume III at 175. Father answered: "Currently, right now." *Id.* In light of the unchallenged findings and evidence set forth above and in the record, we cannot say the trial court clearly erred in finding that a reasonable probability exists that the conditions resulting in T.H.'s removal or the reasons for placement outside Father's care will not be remedied.

[17] To the extent Father challenges the trial court's finding that termination of the parent-child relationship is in the best interest of T.H., we note that in determining the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). The court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before

terminating the parent-child relationship. *Id.* Moreover, the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in a child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[18] When asked what factors determine the best interest of a child, FCM Magerl answered in part that "we try to look at all aspects of a case whenever we're making a decision that regards a child's permanency." Transcript Volume II at 138. When asked if she believed Father should be given more time to parent T.H., she answered in the negative. She also testified that it was DCS's position to terminate Father's parental rights. When asked if it was her position that the parent-child relationship between Father and T.H. should be terminated, CASA Higgins answered affirmatively. When asked if termination of the parent-child relationship would be in the children's best interest, she answered: "It absolutely would be in the children's best interests." Transcript Volume III at 17. Based on the totality of the evidence, we conclude the trial court's determination that termination is in the child's best interests is supported by clear and convincing evidence.

[19] For the foregoing reasons, we affirm the trial court.

[20] Affirmed.

Robb, J., and Crone, J., concur.