## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 10 2019, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Marianne Woolbert
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Marjorie Lawyer-Smith
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of: D.O. (Minor Child)<br><br>L.H. (Mother),<br><br>*Appellant*,<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee*. | September 10, 2019<br><br>Court of Appeals Case No. 19A-JT-693<br><br>Appeal from the Madison Circuit Court<br><br>The Honorable G. George Pancol, Judge<br><br>Trial Court Cause No. 48C02-1805-JT-129 |

**Brown, Judge.**

[1] L.H. ("Mother") appeals the involuntary termination of her parental rights with respect to her child, D.O. We affirm.

## *Facts and Procedural History*

[2] D.O. was born on December 15, 2003, and is a Type I Diabetic with Celiac Disease. In December 2011, the Indiana Department of Child Services ("DCS") alleged that D.O. was a child in need of services ("CHINS"), and Mother later admitted that D.O. was a CHINS. In October 2013, DCS again alleged that D.O. was a CHINS, and Mother later admitted that he was a CHINS. In July 2014, the court dismissed the cause.

[3] In November 2014, DCS again alleged that D.O. was a CHINS and that his condition was seriously endangered as a result of the inability, refusal, or neglect of Mother to supply him with necessary food, medical care, or supervision. It also alleged that Mother was arrested for outstanding warrants related to charges for contempt of court, violation of probation, failure to appear, and driving while suspended and that D.O.'s father was incarcerated until approximately 2018 for felony dealing in cocaine or a narcotic drug. D.O. was removed from the home.

[4] In February 2015, Mother entered an admission that D.O. was a CHINS and that he had medical needs to which she did not properly attend. In April 2015, the court entered a dispositional order requiring Mother to participate in certain services and provide for the medical needs of D.O. in a timely and complete manner including attending all scheduled appointments, following

recommendations of medical personnel, and ensuring medications are taken in the recommended dosages and frequencies specified in the prescription.

[5]     In March 2016, the court issued an Order Approving Permanency Plan stating that D.O. was in foster placement. The order found that DCS had provided referrals for in-home based services, parenting classes, substance abuse counseling, random urinalysis, and supervised visitation for Mother. It found that Mother was not in compliance with the planning ways. She started a substance abuse assessment on October 23, 2015, but left before a drug screen could be performed; she was closed out of a substance abuse referral for noncompliance; she completed a home-based assessment on August 12, 2015, but was closed out for noncompliance; she completed a parenting assessment on October 6, 2015, but was closed out due to not being able to be contacted by phone or address; she refused nine out of eleven random drug screens; she tested positive in December 2015 for Morphine 21.8 ng/mL; she had recently screen tested positive for heroin; and she was closed out of supervised visitation in February 2016 due to no shows. The order provided that, of the permanency planning options available, the plan most appropriate and consistent with the best interests of D.O. was that he be placed for adoption.

[6]     On May 30, 2018, DCS filed a petition to terminate the parent-child relationship of Mother and D.O. A "TPR Summons and Notice of Hearing and Notice of Possible Default Judgment," file-stamped on June 4, 2018, was sent to Mother at an address on West Main Street in Chesterfield, Indiana, and stated that she was required to appear for an initial hearing on June 27, 2018.

Appellant's Appendix Volume II at 55. An affidavit of service on June 14, 2018, indicates the notice was served at the Chesterfield address. On June 27, 2018, the court held an initial hearing at which Mother appeared in person and with her court appointed counsel and scheduled a factfinding hearing for August 27, 2018.[1] On August 22, 2018, the court appointed special advocate for D.O., Nellie Elsten ("CASA Elsten"), filed a report with the court which summarized D.O.'s admissions to Community Hospital and St. John's Hospital and provided that the foster parents reported that D.O. was not hospitalized at all since he has been in foster care.

[7] On August 27, 2018, the court held a hearing at which Mother appeared in person and the court appointed new counsel, Marianne Woolbert, to represent her, and scheduled a hearing for October 23, 2018. An entry in the chronological case summary ("CCS") dated September 28, 2018, states that DCS requested a continuance; an October 2, 2018 entry states the factfinding hearing was set for "10/23/2018 . . . , choice 2"; an October 10, 2018 entry states the hearing was continued until "12/4/2018 at 9:00 AM (Event was rescheduled)"; and a second entry on October 10, 2018, states: "Comes now the Court and resets the fact-finding hearing currently scheduled for 12-4-18 to 11-19-18 at 2:00 p.m." *Id*. at 3. A docket entry detail for the second October 10, 2018 entry states that notices were sent to "Marianne Woolbert (Service by

---

[1] At the initial hearing, after appointing counsel for Mother, the court asked "[s]o, she has received the termination Petition and has now consulted with Counsel," and her counsel replied "[y]es." Transcript Volume I at 6.

Email - Sent successfully)" and to "[Mother] (Service by Standard service for notices - Printed) Notice printed at 10/11/2018 12:02:25 AM to . . . W. Main Street, Chesterfield, IN . . . ." *Id.* at 36. A November 8, 2018 CCS entry states "11/8/2018  4:00:02 PM (Filed) - Created 11/8/2018 3:50:19 PM - TPR Notice of Hearing (10 day)," and lists Mother's name and her address on West Main Street in Chesterfield. *Id.* at 3. The "Notice of Hearing to Terminate the Parent-Child Relationship" file-stamped "11/08/2018 4:00:02 PM" was signed by counsel for DCS, indicates "To: [Mother] . . . W. Main Street Chesterfield, IN . . . ," states the notice was provided in accordance with Ind. Code § 31-35-2-6.5, and sets forth the date, time, and location of the scheduled November 19, 2018 factfinding hearing. *Id.* at 32.

[8]     On November 19, 2018, the court held the factfinding hearing. At the start, DCS's counsel noted that Attorney Woolbert and counsel for D.O.'s father were present and that the parents were not present. The court asked Attorney Woolbert if she was ready to proceed, and she replied affirmatively. The court asked counsel for D.O.'s father if he was ready to proceed, he replied that he had not had contact with his client and asked for a continuance, and the court denied the motion. DCS presented the testimony of CASA Elsten and family case manager Brandy Sorrell ("FCM Sorrell").

[9]     CASA Elsten testified that D.O. was originally removed by DCS in November 2014 for medical neglect, he was repeatedly admitted to the hospital, "the Hospital finally said he would die if . . . the neglect didn't stop," and "[t]he kind of neglect he was facing could cause his life to end." Transcript Volume I at 22.

She testified that "there's a [] very detailed [] food supply he has got to have to be safe," he is a Type I Diabetic and has Celiac disease, "a lot of the things he can have for one, won't work for the other," and D.O.'s parents were failing to meet those needs. *Id*. She indicated that D.O.'s parents were also supposed to be very closely monitoring his blood sugar levels and they were not doing so. She indicated that D.O. had been removed from the home since the dispositional hearing in April 2015, the last time she had contact with Mother was approximately May 2017, the court stopped all visitation in June 2017, and Mother was living with her mother. She indicated that D.O.'s father was in prison twice during the pendency of the case.

[10] When asked about the major barriers to reunification, CASA Elsten replied that D.O. believes "that if he goes home, and he is with his parents, he will die. He doesn't believe that they can take care of him and he can say based on what forty two times that he was admitted to Community and St. John's Hospital . . . [p]rior to the . . . [r]emoval." *Id*. at 26. She indicated that she did not believe the reason for D.O.'s removal and continued placement outside the home has been or will be remedied, it poses a threat to D.O.'s well-being for the parent-child relationship to continue, "he doesn't have any bond or relationship with either parent [] at all and he doesn't want to be with them," "he is afraid for his safety with them," and she believes D.O. is reasonable in his fear for his safety and that it is in his best interests that the parent-child relationship be ended. *Id*. at 27.

[11]     CASA Elsten indicated that D.O. was placed in a pre-adoptive home, he had been there for a couple of years, his grades were excellent and he was on the basketball team, and the foster family had received training on how to care for a child with D.O.'s diseases and they demonstrated the ability to properly care for him. She testified that D.O. had individual counseling for a long time, he and Mother had counseling together for a period of time but he simply would not talk or participate so that was terminated, and the therapist reports that D.O. does not need counseling when he is not under the stress of having to visit his parents. She testified that the stress of visiting his parents has a negative impact on his blood sugar levels and that a letter from a doctor in the CHINS case stated that his blood sugars are "around two twenty five" but that stress "can cause him to go to four hundred very easily." *Id.* at 30. On cross-examination by Attorney Woolbert, CASA Elsten indicated that she did not know if Mother ever started the ordered parenting assessment, that she thought Mother was taking her drug screens and they were clean, and that the house in which she lived was crowded but clean. Upon questioning by counsel for D.O.'s father, she indicated that there were five other children who had been reunified with Mother and were living with her.

[12]     FCM Sorrell indicated that she had been assigned the case for two years and three months and testified as to D.O.'s medical conditions and that the conditions require that he carefully manage the foods that he eats. When asked the reason for his removal, she replied "because of his sugar levels being completely out of control" and the lack of medical attention. *Id.* at 37. When

asked about the services provided, she testified that she believed Mother participated to a certain degree and was able to have the other children returned to her care but that since then she has not complied with any services. She testified Mother "has not done anything since I have been involved," that the last contact she had with Mother was the last court meeting, that she had given her card to Mother and asked her to stay in contact, and that Mother had not responded to any of her calls or messages. *Id*. at 39. She indicated that services were offered to help Mother learn how to deal with D.O.'s medical conditions and that to her knowledge Mother did not participate in and complete those services. She stated that the court discontinued visitation in June of 2017 and that Mother and D.O. had not had contact with each other since then.

[13] When asked about the major barriers for reunification, FCM Sorrell testified:

> [W]hen I first took this case, I sat down with [D.O.] and tried to sit down with [Mother] but [D.O.] had stated that he did not want any contact with [Mother.] I asked about sibling visitation. He had no desire to even see his siblings . . . his stress levels go up anytime you even bring up [Mother], which also . . . causes his sugar levels to arise when he is completely stressed out. [H]e told me that he would talk about it the one time . . . as far as . . . visitation with [Mother] or siblings but then he didn't want to talk about it anymore. [H]e stated that . . . he didn't feel that [Mother] cared about him enough to protect him when she had him and that his siblings do nothing but make fun of him and tease him and he just doesn't feel comfortable or a part of the family.

*Id*. at 40-41. When asked to describe the cooperation and participation in services of each of D.O.'s parents since the filing of the TPR petition, she testified "I have . . . not been able to get either parent to sit down for a child

family team meeting . . . to talk about services or what could be offered since I have been able to take over the case" and "it's my knowledge that the parents haven't done anything since the other children were returned back into their home." *Id.* at 42. When asked if she believed the reason for the removal and continued placement of D.O. outside the home has been remedied, she replied "I do not," "if Mother would have taken the time to go to the Doctor's appointments or learn about her child's illness in order to care for him, I think that would have been a little different but she hasn't taken the time out," "[s]he hasn't asked about her child," "[s]he hasn't even asked if he is okay," and "at this point [Mother] has not reached out for any contact." *Id.*

[14] FCM Sorrell indicated there has not been a significant change in the circumstances since the beginning of the CHINS case. She testified that Mother has not gone to the doctor appointments, has not tried to educate herself, and was offered education and has not complied with any of it. She indicated she believed the continuation of the parent-child relationship poses a threat to D.O.'s well-being and testified, "[i]f this child was returned back into the care of his Mother, with her not having any knowledge of how to care for him and his . . . celiac disease and his diabetes, . . . this child could potentially end up very very ill or possibly even be killed." *Id.* at 44. She indicated she believed it was in D.O.'s best interests that the parent-child relationship be terminated. She testified that D.O. was in a pre-adoptive placement, played sports, was doing well in school, and has really blended into the placement family who monitors his sugar levels and diet. She further testified "when I did talk to [D.O.] about

his parents and about his siblings, the fear that overcome [his] face was something that I don't think that I have seen since I have been a caseworker," "he was petrified that I was gonna re-start his visitation," and "I was just trying to get a better understanding from his point of view when I was asking him these questions, but I think that the Court should know that this child is really scared that we would have anything uh he has to have anything to do with his parents or siblings." *Id.* at 45. She also testified "I have reason to believe that if [D.O.] was to be placed back with . . . either parent, he would in turn run away" and "I have reason to believe that he is so fearful for his life that he would not remain in the care of his parents." *Id.* at 48. The court admitted the filings and orders in the CHINS actions.

[15] On March 6, 2019, the court issued an eighteen-page order terminating the parent-child relationship of Mother and D.O. which includes numerous findings of fact in accordance with the above testimony and provides in part:

* * * * *

q.      The Dispositional Decree was entered on April 2, 2015 in the underlying CHINS case.

r.      The child has been continuously removed from the parents since the date of the Dispositional Decree.

* * * * *

q.      Since the filing of the TPR Petition, the parents have done nothing to cooperate and participate in the CHINS proceeding or care of the child. This has been the case since the other children were returned to [Mother's] care.

s.     There has not been a significant change in circumstances since the outset of the CHINS case.

t.     Since the FCM has had the case, neither parent has demonstrated the ability to properly care for the child with his special medical needs.

* * * * *

b.     DCS originally became involved with the family through an informal adjustment; however, the child's medical condition only continued to worsen. Riley Children's Hospital reported that if the child's medical condition worsened further due to lack of care, it would be fatal to [D.O.]. [D.O.] was then placed in the hospital for medical treatment. He was, upon his release from the hospital placed in Foster Care to be sure that his medical needs were met.

c.     Medical records were obtained from Community Hospital and show his admissions as: 2-2-2005, 2-20-2005, 5-2-2005, 3-4-2007, 4-4-2007, 11-1-2007, 7-18-2009, 9-27-2009, 11[-]12[-]2010, 10-21-2009, 12-26-2010, 10-15-2011, 10-22-2011, 10-10-2011, 12-19-2011, 12-31-2011, 4-8-2012, 3-27-2012, 1-10-2013, 12-6-2013, 11-24-2013, 1-27-2014, 1-24-2015, and 1-12-2015. Medical records show that [D.O.] was admitted to St. Johns Hospital on 5-18-2010, 10-12-2013, 11-30-2014, and 12-8-2014. This list was not all-inclusive as the child had also been hospitalized at Riley Children's Hospital.

d.     The Foster Parents reported to CASA that the minor child has not been hospitalized at all since he has been in foster care.

Appellant's Appendix Volume II at 17-21. The court concluded that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the child's well-being, there is a reasonable probability that the conditions that resulted in the child's removal from and continued placement outside the care and custody of the parents will not be remedied, termination of the parent-child relationship between Mother and D.O. is in the best interests of

the child, and the plan of DCS for the care and treatment of the child, adoption, is acceptable and satisfactory.

## *Discussion*

Mother claims that DCS failed to show by clear and convincing evidence that her parental rights to D.O. should be terminated. She argues "[i]t seems illogical that an agency, a court or a therapist would allow a child to dictate his relationship with his parent let alone the direction of a court case," that D.O.'s medical condition has stabilized, that she completed services, that DCS failed to produce D.O.'s therapist or admit records about his medical situation, and that she provides care for her other five children. Appellant's Brief at 12. She also cites Ind. Code § 31-35-2-6.5, argues the trial court and DCS violated her due process rights by proceeding with the factfinding hearing in her absence, and asserts that, while the CCS reflects that DCS filed "a ten-day letter," there is no receipt of service for that letter. Appellant's Brief at 14. DCS responds that Mother does not specifically challenge any of the trial court's findings of fact, that she has a long history of not adequately caring for D.O.'s serious medical needs, that D.O. was admitted to the hospital forty-two times while in Mother's care, that Mother's participation in services was sporadic and she did not complete services provided to help her learn how to care for D.O.'s specialized needs, and that, once she regained custody of her other children, she became uncooperative with DCS and CASA. It also argues that it sent the required notice to Mother at least ten days before the hearing and that she received sufficient notice of the hearing to satisfy due process.

[17]   Ind. Code § 31-35-2-6.5 provides in part that, at least ten days before a hearing on a petition under the chapter, the person or entity who filed the petition to terminate the parent-child relationship "shall send notice of the review" to the child's parent. A fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *In re T.W.*, 831 N.E.2d 1242, 1245 (Ind. Ct. App. 2005) (citation omitted). To comply with the statute, one need only meet the requirements of Ind. Trial Rule 5, which governs service of subsequent papers and pleadings in an action and authorizes service by United States mail "by delivering or mailing a copy of the papers to him at his *last known address.*"[2] *In re C.C.*, 788 N.E.2d 847, 851 (Ind. Ct. App. 2003) (citing Ind. Trial Rule 5(B)), *trans. denied*. Further, this court has observed in discussing Ind. Code § 31-35-2-6.5 that statutory notice is a procedural precedent but not an element of the plaintiff's claim, that failure to comply with a statutory notice is a defense that must be asserted, and that, once placed in issue, the plaintiff bears the burden of proving compliance with the statute. *See In re T.W.*, 831 N.E.2d at 1246 (citations omitted).

---

[2] We explained:

> Indiana Code § 31-35-2-6.5 does not require compliance with Indiana Trial Rule 4, which governs service of process and incorporates a jurisdictional component. . . . To require service of subsequent papers, such as hearing notices, to rise to the level of service of process would permit a parent or other party entitled to notice to frustrate the process by failing to provide a correct address and would add unnecessarily to the expense and delay in termination proceedings when existing provisions adequately safeguard a parent's due process rights.

*In re C.C.*, 788 N.E.2d at 851 (citation and internal quotation marks omitted).

[18]   The record reveals that a summons and notice with respect to the June 27, 2018 initial hearing was sent to Mother at her address on West Main Street in Chesterfield and that she appeared for the initial hearing. On October 10, 2018, the court rescheduled the factfinding hearing for November 19, 2018, and an October 10, 2018 docket entry detail indicates that notice of the November 19, 2018 hearing was sent to Mother, again to the address in Chesterfield. On November 8, 2018, a notice of the factfinding hearing signed by DCS's counsel was filed which listed Mother and the Chesterfield address. At the start of the scheduled hearing on November 19, 2018, it was noted that Attorney Woolbert and counsel for D.O.'s father were present but that the parents were not present. When asked if she was ready to proceed, Attorney Woolbert replied affirmatively. She did not request a continuance. Attorney Woolbert represented Mother at the hearing and cross-examined DCS's witnesses. Mother does not point to the record to show that her counsel objected to proceeding in her absence or argue that the Chesterfield address was not her last known address. In light of the record, Mother has not established that DCS failed to provide notice of the final hearing or that she was denied due process. *See In re C.C.*, 788 N.E.2d at 852-853 (holding that, as notice of the final termination hearing was mailed to the alleged father's last known address at a homeless shelter, the notice complied with Ind. Code § 31-35-2-6.5, observing the alleged father's rights were not significantly compromised in that he was represented by counsel throughout the proceedings and at the final termination proceeding, and that his counsel was able to and did cross-examine the State's witnesses, and concluding that the trial court's denial of his counsel's request

for a continuance and decision to proceed in the alleged father's absence did not deny him due process).

[19] We next turn to the evidence. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[20] A finding in a proceeding to terminate parental rights must be based upon "clear and convincing evidence." Ind. Code § 31-37-14-2. This is "a heightened burden of proof reflecting termination's serious social consequences." *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (citation and internal quotation marks omitted). We do not reweigh the evidence or determine the

credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*. Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. Our review must give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand, and not set aside its findings or judgment unless clearly erroneous.'" *Id*. (citation omitted). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640.

[21] The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). In determining whether the conditions that resulted in a child's removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial

probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id.* Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[22] To the extent Mother does not challenge the court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge the trial court's findings resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[23] The trial court found that D.O. was removed from the home due to medical neglect, that he was a Type I Diabetic and has Celiac Disease, and that prior to the removal he had been repeatedly admitted to the hospital. It found that there is a detailed list of foods that D.O. cannot eat, Mother failed to accommodate his

needs, and she was supposed to closely monitor his blood glucose levels but did not do so. The court found that D.O. believes that he will die if he returns home, that he has no desire to have contact with Mother or his siblings, and that his stress level increases when Mother is brought up which causes his sugar levels to rise. It further found that Mother has done nothing to cooperate and participate with DCS since the TPR petition was filed and there has not been a significant change in circumstances since the outset of the CHINS case. The testimony and evidence admitted at the factfinding hearing as set forth above and in the record supports the court's findings. Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determinations that there is a reasonable probability that the conditions leading to D.O.'s removal will not be remedied and that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to his well-being.

[24] In determining the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). The court must subordinate the interests of the parent to those of the child. *Id.* The recommendation of the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

CASA Elsten and FCM Sorrell testified that termination of the parent-child relationship is in D.O.'s best interests. Based on the totality of the evidence, we conclude that the trial court's determination that termination is in D.O.'s best interests is supported by clear and convincing evidence.

[25] For the foregoing reasons, we affirm the trial court's judgment.

[26] Affirmed.

Altice, J., and Tavitas, J., concur.