## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 26 2019, 7:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Jeffery Haupt
Law Office of Jeffery Haupt
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of: S.M., Minor Child,<br><br>L.M., Mother,<br><br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | November 26, 2019<br><br>Court of Appeals Case No. 19A-JT-1200<br><br>Appeal from the St. Joseph Probate Court<br><br>The Honorable Jason Cichowicz, Judge<br><br>The Honorable Graham Polando, Magistrate<br><br>Trial Court Cause No. 71J01-1809-JT-132 |

**Brown, Judge.**

[1] L.M. ("Mother") appeals the involuntary termination of her parental rights with respect to S.M. We affirm.

## *Facts and Procedural History*

[2] S.M. was born on April 28, 2017, stayed in the hospital for approximately a month, and was placed in kinship care with S.B. and J.B., who also allowed Mother to stay in their home for a period of time.[1] On May 30, 2017, the Department of Child Services ("DCS") filed a petition alleging S.M. was a child in need of services ("CHINS") and incorporated a preliminary inquiry and investigation report stating: S.M. was born premature at twenty-nine weeks, tested positive for marijuana, and was removed on May 25, 2017; and Mother, who was "positive for marijuana at birth," claimed to have drank and smoked marijuana while pregnant. Exhibits Volume at 7. In June 2017, Mother admitted to the material allegations. On September 18, 2017, the court issued a disposition order placing S.M. into relative placement and requiring Mother to keep the family case manager informed of changes of address or phone number, complete a parenting psychological assessment, continue with random drug screens and home-based therapy, sign all necessary release forms, see to S.M.'s medical and emotional needs, cooperate with service providers to secure a stable home environment, and follow all household rules while in the kinship house.

---

[1] An August 18, 2017 addendum to the predispositional report indicates that S.B. and J.B. asked Mother to leave their home on August 15, 2017.

[3] On November 30, 2017, DCS filed a motion to modify dispositional decree and, following a December 18, 2017 hearing, the court suspended Mother's parenting time. After a March 12, 2018 hearing at which Mother appeared, the court found her to be noncompliant and took the proposed permanency plan under advisement. On April 30, 2018, the court changed S.M.'s permanency plan to adoption.

[4] On September 26, 2018, DCS filed a petition to terminate Mother's parental rights. On March 19, 2019, the court held a termination hearing, and Family Case Manager Arielle Williams-Winston ("FCM Williams-Winston") testified: Mother did not relate any changes in address or phone number and there was a period of no contact that lasted over a year; her psychosocial referral was cancelled after a missed initial appointment; at least three psychosocial referrals were never fulfilled; she completed drug screens in the beginning months of July and August 2017, was noncompliant afterwards, and DCS cancelled the referral. FCM Williams-Winston also stated that Mother never had a home of her own; her referral for a home-based case worker was cancelled due to lack of contact; and that she never engaged in the home-based therapy or visitations and the referrals for them were cancelled. She indicated that Mother refused to speak with her or the court appointed special advocate on numerous occasions, that two certified letters were returned as Mother did not live at the residence, and that she had three different phone numbers at one point for Mother. With regard to addressing S.M.'s medical and emotional needs, FCM Williams-Winston testified she understood the requirement to mean "basically providing

care for the child and obviously staying up to date on all his medical needs and shot records just because of him also being born premature, there's a lot of follow-up appointments." Transcript at 15. She indicated a home-based case worker provided transportation services for Mother who did not attend or ask to attend any doctor appointments and that she did not have means of transportation to be able to provide for S.M.'s necessary appointments. She testified Mother last saw S.M. on the day after he was placed in relative placement and that, "just by observing the one . . . or two visitations that [she had] seen . . . there wasn't very much interaction, not normal mother and child bonding." *Id.* at 19. She testified that Mother was employed in late 2017 for "maybe a month" and in early 2018 at a Jimmy John's, and indicated that DCS was still unsure of her employment status, source of income, and her housing situation. *Id.* at 17. During redirect examination, she indicated that at some point in the case there had been a putative father to S.M. in C., but the DNA test results were negative.

[5] FCM Williams-Winston indicated that termination was in S.M.'s best interest and, when asked to explain why maintaining the parent-child relationship would threaten his well-being, answered that S.M. did not know Mother, had unattended medical needs when relative placement occurred, and had "to be monitored yearly for his issue that he has with his kidneys," something that she thought Mother would not be able to do. *Id.* at 20. When describing S.M.'s adoptive home with his grandmother and great-grandmother, FCM Williams-

Winston stated that he had progressed since placement, was active, and had bonded with great-grandmother.

[6] Court Appointed Special Advocate Sharon LaPara ("CASA LaPara") testified that she attempted to speak with Mother, who "kind of, never contacted me when I would try to call her, you know, there was no way, she didn't answer, or her phone wasn't working." *Id.* at 32. When asked whether maintaining the parent-child relationship would threaten S.M.'s well-being, she answered "[a]bsolutely" and explained that she did not think Mother was capable of caring for him based on observations of her parenting skills, interest in visits, interest in communicating with DCS, and participation in court services. *Id.* at 33. When asked about DCS's plan for adoption, she stated that she believed "that would be the best thing that could ever happen to him." *Id.* at 34.

[7] Mother indicated that, after moving out of S.B. and J.B.'s home, she stayed with C. for approximately a year, with her Jimmy John's boss for three months at some point in 2018 until "it just didn't work out there," and with somebody whom she had started dating. *Id.* at 40. She stated that she now resides with her friend C.H. and has been since October 2018. She answered in the negative when asked if she ever refused to talk to the case manager and stated that she would call her case manager at least once a week, "[b]ut it was usually a few times a week." *Id.* at 42. She indicated that she did not have a car, that C.H. had one but "he works long hours, . . . he works nightshift job, so you know, when he's awake, it's you know," that she was not working now, and that she was due

to have a baby on April 15th and was attending Bella Vita classes from a pregnancy resource center in Knox. *Id.* at 44.

[8] On May 15, 2019, the court terminated Mother's rights and found that S.M. has never returned to Mother's care, that he had been removed for over seventeen months at the time of the hearing, and that she largely failed to comply with the dispositional decree. It also found: Mother attempted to blame FCM Williams-Winston for the lack of communication, that FCM Williams-Winston "went above and beyond in attempting to maintain contact with Mother," and that Mother largely failed to submit to random drug screens and failed to engage in provided assistance to secure a stable home environment until it "was eventually canceled by the agency." Appellant's Appendix Volume II at 51. Before finding that DCS had established that Mother will not remedy the conditions resulting in removal, it stated that

> [i]n short, Mother is in only a slightly better position now vis-a-vis the Child then she was at the time of his removal. She had been in her current home for approximately five months at the time of the evidentiary hearing, and, as the Department points out, is subject to the whim of yet another friend – whims that have proven disastrous for her housing situation on more than one occasion. She had not been employed for eight months.

*Id.* at 52. In its "Best Interests and Satisfactory Plan," the court concluded that Mother "is essentially a stranger" to S.M., "who, since this case began, has seen his CASA far more" than Mother, and described two episodes that served as

poignant examples of Mother's inability to prioritize the Child. In one, Mother declined to meet with the CASA so she could help the brother of the man she alleged to be the Child's Father move. In another, when the previous [DCS FCM] actually attempted to pick Mother up to attend a visit, Mother declined to get into the car until she had finished her cigarette.

*Id.* at 53. It found S.M. was "doing well in his current home, essentially the only home he has ever known, and certainly the most stable," termination was in his best interest, and that adoption was satisfactory. *Id.*

## *Discussion*

The issue is whether sufficient evidence supports the termination of Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence. Ind. Code § 31-37-14-2. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id.* Reviewing whether the evidence "clearly and convincingly" supports the findings, or the findings "clearly and convincingly" support the judgment, is not a license to reweigh the evidence. *Id.* Our review must give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand and not set aside its findings or judgment unless clearly erroneous. *Id.* "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

[10] The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that

the conditions resulting in the removal or reasons for placement of S.M. outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[11] Mother disputes the court's general assessment that she is only in a slightly better position now then she was at the time of S.M.'s removal and argues that she has "accepted help, and in fact went and found services on her own . . . to improve her parenting skills." Appellant's Brief at 12. She concedes that she "did not have a good showing in the early stages of the CHINS case" and did not complete many of the requirements of the dispositional order regardless of her transportation or communication issues, but asks this Court to examine her life situation when the termination proceedings began and maintains that it is "in a much [more] secure and stable place than it has been in a while." *Id.* at 8. With respect to the best interest of S.M., Mother contends that the court failed to account for her youth and the communication and transportation difficulties she "had during the time of the CHINS case" and argues that the passage of time from her suspension of parenting time to the termination hearing is insufficient to support the court's conclusion that she is essentially a stranger to him. *Id.* at 13.

[12] In determining whether the conditions that resulted in a child's removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements

against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id.* Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[13] To the extent Mother does not challenge certain findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[14] The record reveals that S.M. was removed on May 25, 2017, and that Mother did not continue with drug screens or home-based therapy, cooperate with service providers to secure a stable home environment, or address S.M.'s medical and

emotional needs. FCM Williams-Winston testified that Mother refused to speak with her or the special advocate on numerous occasions and they had no contact for over a year, and that Mother did not attend or ask to attend any doctor appointments despite the availability of transportation services. Mother testified to four separate housing arrangements since S.M.'s removal and indicated she was not currently employed and did not have reliable transportation. Based upon the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to S.M.'s removal will not be remedied.

[15]     In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). The court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification, and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry. *Id.* at 648. Recommendations by both the case manager and the child advocate to terminate parental rights, in addition to

evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[16] Our review of the evidence reveals DCS has been involved with S.M. since the CHINS case began shortly after his birth. Mother does not dispute that she has not seen him since September 2017 or that he was never returned to her care. She also does not dispute, as the court found, her inability to prioritize him. FCM Williams-Winston testified that termination was in S.M.'s best interest, S.M. did not know Mother, and that she would not be able to provide for his medical needs. CASA LaPara testified that Mother was incapable of caring for S.M. and that adoption was best for him.

[17] We find no error and affirm the termination of Mother's parental rights.

[18] Affirmed.

Altice, J., and Tavitas, J., concur.