## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 22 2020, 6:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of: K.T. (Minor Child)

M.T. (Mother),

*Appellant*,

v.

Indiana Department of Child Services,

*Appellee*.

January 22, 2020

Court of Appeals Case No. 19A-JT-2352

Appeal from the Floyd Circuit Court

The Honorable J. Terrence Cody, Judge

Trial Court Cause No. 22C01-1712-JT-918

**Brown, Judge.**

[1] M.T. ("Mother") appeals the involuntary termination of her parental rights to her child, K.T. We affirm.

*Facts and Procedural History*

[2] K.T. was born in December 2006. Mother agreed to an informal adjustment in September 2015 to address educational neglect. Mother tested positive for methamphetamine during the adjustment period. In March 2016, the Indiana Department of Child Services ("DCS" ) filed a petition alleging that K.T. was a child in need of services ("CHINS"), and the court found K.T. was a CHINS. In June 2016, the court issued an emergency custody order stating that Mother continued to use methamphetamine and ordering that K.T. be removed from the home environment. In July 2016, the court entered a dispositional order requiring that Mother complete certain services, keep all appointments, maintain suitable housing, not use illegal substances, complete a substance abuse assessment and follow all recommendations, submit to random drug screens, and attend all scheduled visitations.

[3] In December 2017, DCS filed a petition to terminate the parent-child relationship of Mother and K.T. In July 2018, the court held a hearing. Family Case Manager Amanda Green ("FCM Green") testified that she worked with Mother and K.T. from September 2015 until May 2017, that Mother had periods of homelessness and lived in a hotel for a time, preventing K.T. from attending school, and that K.T. attended sixty-two days of school one year. She testified that Mother continued to use drugs, refused drug screens, and stated that she would test positive. She testified there were also concerns regarding

Mother's mental health, Mother had a family history of mental health issues, DCS tried to provide services and treatment, Mother did not follow through with service providers, DCS went through several providers because Mother did not meet with them or would threaten their workers at times, and Mother went through almost every provider available for case management and therapy services. She indicated that she attempted to provide Mother with drug treatment services and offered to take her to facilities, that many times Mother would refuse, and that Mother participated in three days of a five-day detox program with Harbor Lights but left because she had an argument with a nurse about her medications. She indicated that Mother received disability benefits and was referred for home-based case management to assist with budgeting, parenting skills, therapy and drug treatment, and supervised visitations after removal. She testified that Mother's participation in visitation was very sporadic and that she would participate for three or four weeks but then fail to show up or cancel. She indicated there were also issues with Mother threatening providers and that the providers would refuse to pick up Mother.

[4]    FCM Green testified that Mother had been unable to address her drug use and mental health issues. She indicated that Mother threatened to hurt service providers because things did not go her way, that she started to show up randomly at one provider's office and the provider locked its doors during business hours, and that Mother would curse and make a scene in the office. She indicated the police had been contacted in response to Mother's behaviors, that Mother would say that she "hope[s] you die" and "I'm going to kill myself

and it would be all your fault," and that she would bring others such as family members into the threats. Transcript Volume II at 37. She testified that Mother was upset because she was not permitted to have unsupervised visitation, waited for her outside the office at the end of the day, and "got mad and started threatening, saying that she hoped I died and she hoped my kids were taken, my kids were removed, and that . . . something happened to my kids." *Id.* at 38. FCM Green indicated that, if Mother had complied with all of the requested drug screens, she would have submitted to about 200 drug screens from September 2015 through May 2017. She indicated that, during her involvement in the case, Mother did not participate in any kind of mental health services and that there were a few times that Mother contacted her saying that she had been sent to Clark Memorial or checked herself into Wellstone for psychotic breakdowns. She indicated that the service providers bent over backwards for Mother, the efforts had not been successful, and she believed the only way to achieve stability and permanency was to terminate Mother's parental rights.

[5] Alexa Hesen, a home-based family case manager with Family Ark, testified that Mother attended five of twenty scheduled appointments with her between December 2017 and April 2018 and did not attend three scheduled group meetings. She indicated there were a couple of times that Mother admitted that she had been using drugs days before and that she knew she would test positive.

[6]     Mother testified that she fought for and protected K.T. and that she was not an unfit mother. She testified that the last time she used methamphetamine was approximately three days earlier.

[7]     Family Case Manager Nicole Hasenour ("FCM Hasenour") testified that, when she was assigned the case in May 2017, Mother was very verbally aggressive with her and thus a supervisor was always present during their interactions, that the police were called on multiple occasions, that certain service providers would not work with Mother, that she offered transportation to treatment with Volunteers of America but Mother refused to go, stating that she needed to get everything out of her storage unit, and that multiple treatments were offered but Mother refused every time. She testified that Mother was homeless for a time and refused multiple offers to stay at homeless facilities. She testified that in December 2017 Mother asked for and DCS provided a referral for a suboxone treatment program, Mother was discharged from the program because she did not have suboxone in her system, and later she completed three to five days of treatment at Our Lady of Peace. She testified that Mother had engaged off and on in a multitude of services, that she had not fully completed anything, that she went to inpatient treatment at Harbor Lights but left the treatment fairly early on and did not complete detox, that she went to the Turning Point treatment facility and was only there for a number of hours, and that she was offered Groups Recover Together suboxone treatment and was there for about three months but did not complete the treatment and was discharged.

[8]     FCM Hasenour testified that Mother was also offered outpatient treatment programs through ACP, that her ACP provider discharged her due to her verbal aggressiveness, that she was offered casework through Home of the Innocents, Family Ark, and ACP, two of which discharged her for verbal aggressiveness and one of which discharged her for noncompliance, and that she had been offered supervised visitation through Family Ark which had been successful throughout 2017 until the hearing. She testified that Mother had submitted to approximately thirty-one drug screens and that about fifteen of them had been positive. She testified that Mother would have been required to submit to two screens a week, that it was very difficult to obtain drug screens from Mother, and that, when she asked Mother for a drug screen, she would scream, storm out of the office, and slam things. She testified that Mother has refused drug screens on numerous occasions and stated many times that she knew DCS would want to use the screens against her. She testified that Mother informed her in September 2017 that she had overdosed over the weekend.

[9]     FCM Hasenour further testified that Mother has mental health issues and exhibits paranoia. She indicated that she received a phone call from Mother about two weeks earlier during which Mother stated that a gang was after her, the gang had been watching her and installed video cameras in her shower, and when she wakes up in the morning she feels she had been sexually violated. She indicated that Mother has stated that someone has replaced her mother's ashes with beach sand and that the gang stole her car, placed drugs in her food, and made her cat drink Coca-Cola. She indicated that Mother was referred to

medication management at Family Ark, went to two of the meetings, did not show up for the rest of the meetings, and had multiple therapists who refused to work with her because of her verbal and physical aggression. She indicated Mother had not done anything during the duration of the CHINS matter to address her substance abuse issues and instability, that Mother currently had an eviction notice and she had known her to be homeless, that she did not believe the conditions which existed at the time of removal have changed or were likely to change anytime in the near future, and that termination of Mother's parental rights was in K.T.'s best interests.

[10]  Court Appointed Special Advocate Lorie Edwards ("CASA Edwards") testified that she believed K.T. had been traumatized, that from what she had seen she did not have reason to believe the issues that led to K.T.'s removal were likely to change, that termination of Mother's parental rights is in K.T.'s best interest, and that K.T. had told her that she wants to be adopted.

[11]  In August 2018, the trial court issued a one-page termination order. On appeal, this Court issued a memorandum decision stating that the findings of the trial court were sparse and remanding for the entry of proper findings and conclusions. *See In Re: The Termination of the Parent-Child Relationship of K.T.*, No. 18A-JT-2228 (Ind. Ct. App. April 30, 2019). On September 6, 2019, the trial court issued an amended order which included findings of fact and provides in part:

> 12. Mother has failed to substantially comply with the dispositional order and specifically, Mother:

a. Failed to complete a drug abuse assessment and failure to participate in and complete a substance abuse program despite having multiple opportunities to do so;

b. Failed to gain sobriety and continued to abuse methamphetamine during the life of this case with Mother admitting during the July 11, 2018 hearing to using methamphetamine several days before the hearing;

c. Failed to obtain and/or maintain suitable housing and was homeless for a significant amount of time during the pendency of this matter;

d. Failed to obtain and/or maintain employment and remained largely unemployed throughout the pendency of this matter;

e. Failed to submit to random drug testing as requested and only submitted to a total of thirty-one (31) drug screens between October 8, 2015 – March 15, 2018, all of which were positive for Amphetamine and Methamphetamine;[1]

f. Failed to seek and maintain treatment for significant mental and emotional issues which created a barrier to reunification;

g. Failed to participate in all scheduled visitations and did not conduct herself in a suitable manner in a substantial number of visitations that Mother did attend.

h. Failed to follow up on service referrals and participate in services despite multiple opportunities to do so that would have assisted Mother in achieving the original permanency plan of reunification.

13. Mother's continued substance abuse poses a danger to the health, safety and well-being of the Child.

* * * * *

---

[1] FCM Hasenour testified that Mother had submitted to roughly thirty-one drug screens, about fifteen of which had been positive.

15. CASA filed a report and provided testimony in support of the termination of parental rights in this instance.

Appellant's Appendix Volume II at 87-88. The court concluded there is a reasonable probability that the conditions that resulted in the child's removal from and continued placement outside the home will not be remedied or the continuation of the parent-child relationship poses a threat to the child's well-being, termination of parental rights is in the child's best interests, and there is a satisfactory plan for the care and treatment of the child.

*Discussion*

[12] Mother claims that the trial court's findings do not support its conclusions that the reasons for removal will not be remedied or that termination is in the child's best interests. She argues there is no evidence that K.T. was endangered by her drug use and the court's judgment was a punishment for historical failures and not an evaluation of her fitness to parent at the time of the termination hearing. She asserts "there is simply no evidence that the Child was ever neglected . . . , only evidence that she failed to overcome her drug addiction and that she did not participate in services." Appellant's Brief at 24. DCS responds that Mother was an active methamphetamine user who last used the drug three days before the termination hearing, Mother did not participate in most of the services referred to help her stop using methamphetamine, and the court did not clearly err in terminating her parental rights.

[13] In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[14] A finding in a proceeding to terminate parental rights must be based upon "clear and convincing evidence." Ind. Code § 31-37-14-2. This is "a heightened burden of proof reflecting termination's serious social consequences." *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (citation and internal quotation marks omitted). We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id.* We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id.* Reviewing whether the evidence clearly and

convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. Our review must give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand, and not set aside its findings or judgment unless clearly erroneous.'" *Id*. (citation omitted). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640.

[15] The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). In determining whether the conditions that resulted in a child's removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future

behavior. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id.* Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[16] The trial court found that Mother failed to participate in and complete a substance abuse program despite having multiple opportunities to do so, continued to abuse methamphetamine including several days before the hearing, failed to maintain suitable housing, failed to submit to random drug testing as requested and only submitted to thirty-one drug screens, failed to seek and maintain treatment for significant mental and emotional issues which created a barrier to reunification, and failed to participate in services despite multiple opportunities to do so which would have assisted her in achieving the original plan of reunification. The testimony and evidence admitted at the hearing as set forth above and in the record support these findings. We conclude that clear and convincing evidence supports the trial court's determinations that there is a reasonable probability that the conditions which

resulted in K.T.'s placement outside the home will not be remedied and that the continuation of the parent-child relationship poses a threat to K.T.'s well-being.

[17] In determining the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). The court must subordinate the interests of the parent to those of the child. *Id.* The recommendation of the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*. FCM Hasenour and CASA Edwards testified that termination of the parent-child relationship is in K.T.'s best interests. Based on the totality of the evidence, we conclude that the trial court's determination that termination is in K.T.'s best interests is supported by clear and convincing evidence.

[18] For the foregoing reasons, we affirm the trial court's judgment.

[19] Affirmed.

Baker, J., and Riley, J., concur.