## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 07 2020, 8:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Megan Quirk
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent Child Relationship M.R. (Minor Child),

C.R. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

October 7, 2020

Court of Appeals Case No.
20A-JT-1013

Appeal from the Delaware Circuit Court

The Honorable Kimberly S. Dowling, Judge

Trial Court Cause No.
18C02-1911-JT-241

**Brown, Judge.**

[1] C.R. ("Mother") appeals the involuntary termination of her parental rights to her child M.R. We affirm.

*Facts and Procedural History*

[2] On January 30, 2018, Mother gave birth to M.R. On July 23, 2018, the Indiana Department of Child Services ("DCS") filed a verified petition alleging M.R. to be a child in need of services ("CHINS"). DCS alleged that: on July 19, 2018, Mother left M.R. in the care of an acquaintance who left her in the care of the manager of a McDonald's; Mother informed DCS that she has a cognitive delay, seizures, and anxiety and that she is prescribed medication to address her seizures and anxiety but she does not take it as prescribed; and Mother is unable to secure and maintain suitable housing. DCS further alleged that Mother was arrested on July 19, 2018, for a preliminary charge of neglect of a dependent, and the child was observed to have an abrasion on her right toe, linear bruising on her lower left leg, and a yeast infection in her left armpit; medical staff informed DCS that the bruising on M.R.'s left leg was likely caused by something wrapped around the leg; and Mother recently moved in with a male who had prior convictions for attempted murder and kidnapping and had recently been released from the Department of Correction and was listed on the Sex Offender Registry.

[3] On January 14, 2019, the court entered a dispositional order which awarded DCS wardship of M.R. It required Mother to contact the family case manager every week; keep all appointments with any service provider; maintain suitable, safe, and stable housing; secure and maintain a legal and stable source of

income; assist in the formulation and implementation of a protection plan to protect the child from abuse or neglect from any person; ensure the child is properly clothed, fed, and supervised; not use, consume, manufacture, trade, distribute, or sell any illegal controlled substances; complete a parenting assessment and all recommendations developed as a result; complete a psychological evaluation; attend all scheduled visitations; and participate in individual therapy services.

[4] On October 21, 2019, the court entered an order approving the permanency plan of adoption and which stated that Mother was no longer court-ordered to engage in services but could do so voluntarily and she may have fully supervised visitation with the child.

[5] On November 27, 2019, DCS filed a verified petition for involuntary termination of Mother's parent-child relationship.[1] On March 3, 2020, the court held a factfinding hearing at which Mother initially appeared with her counsel.[2] After the trial court took judicial notice of all orders and motions in the CHINS case, DCS presented the testimony of: Dr. Courtney Washington, a clinical psychologist; Kelli Smith, a physical therapist and rehab coordinator

---

[1] DCS also sought the termination of father's parent-child relationship. At the March 3, 2020 hearing, father's counsel presented the court with a consent for adoption signed by father.

[2] At the beginning of the hearing, DCS's counsel: "I do want to put on the record that [Mother] was given notice on January 2, 2020. It was mailed to her address, as well as filed with the court in the JT cause number. So she was aware of today's hearing." *Id.* at 15. The court later stated: "Mother . . . appeared late this morning but was here with her attorney, Mr. Painter." *Id.* at 67. Mother did not return for the hearing after the lunch recess.

who worked with M.R.; Marissa Barnett, a speech language pathologist who worked with M.R.; Kristi Fierce, a therapist who worked with Mother since June of 2019; Windy Thompson, a parent aide; Stacy O'Neal, a family support specialist employed by Centerstone who supervised visitation between Mother and M.R.; Family Case Manager Mischa Davis ("FCM Davis"); and Court Appointed Special Advocate Tina Yoder ("CASA Yoder").

[6] Barnett, the speech language therapist, testified that M.R. was diagnosed with a form of seizure disorder and Triple X Syndrome, a genetic condition, and she needed a feeding tube in May 2019. O'Neal testified that the feeding schedule was "pretty strict as far as [M.R.'s] tube feeding" and that Mother needed prompting on what times to feed her. Transcript Volume II at 72.

[7] During the hearing and the presentation of DCS's evidence, the court stated that it would prefer to break around 11:20 a.m. and begin as close to 1:00 p.m. as possible. Mother's counsel stated that Mother had a doctor's appointment at 12:15 p.m., and Mother would go to her appointment "but, if she can't be timely seen, she will come back here and be here by 1:15." *Id.* at 52.

[8] After the lunch recess, Mother's counsel informed the court that Mother was in the building but did not want to be present for the remainder of the hearing, that he explained to her that could adversely affect her case, and she indicated to him that she did not want to be present. After DCS rested, Mother's counsel stated: "Since my client is not here, Judge, I have no evidence to present." *Id.* at 100.

On April 14, 2020, the court entered an order terminating Mother's parental rights. The court found:

> 12. On October 21, 2019, the Court in the CHINS proceeding held another permanency hearing and entered its Order thereon. The Court accepted DCS' recommendation to change the child's permanency plan to Termination of the parent-child relationship.
>
> 13. The Court found that [Mother] had been partially compliant with the child's case plan. Home based casework was referred for [Mother] to work on parenting skills, locate housing, medication management and budgeting. Mother did not fully engage in home-based casework. Mother insisted that she had found housing on her own but continued to stay with friends. Mother refused to stay at the YWCA and was denied housing at Middletown Gardens. Mother had refused to cooperate with DCS when asked about her source of income. Mother completed her clinical assessment and was recommended that she engage in DBT therapy, psychological exam and parenting assessment within 6 months. Mother has completed the psychological evaluation and the parenting assessment. Mother had begun therapy at Centerstone and had begun to be more consistent in the past 30 days.
>
> 14. On January 13, 2020, the Court in the CHINS proceeding held its first periodic case review and entered its Order wherein [M.R.] remained outside Mother's care.
>
> 15. The Court found that [Mother] had not enhanced her ability to fulfill her parental obligations. DCS was no longer financially obligated for services. Mother had completed her clinical assessment. It was recommended that [Mother] participate in DBT therapy and complete a psychological evaluation and a parenting assessment within 6 months. Mother completed her psychological evaluation and parenting assessment on 6/27/19. Mother has not had her injection for her personality disorder since February 2019. Mother had been reminded multiple

occasions to take her injection. Mother had other prescriptions and had informed FCM that she does not like how the medication makes her feel and she wasn't going to take the medication. Mother was encouraged to follow up with her doctor and discuss the issues with her medication but Mother had failed to. Mother informed FCM that she had an appointment on July 30, 2019 at the Anderson Center. However, Mother informed the FCM that she was no longer able to attend the Anderson Center due to being discharged for not attending appointments.

\* \* \* \* \*

19. Mother did participate in homebased casework but she did not complete that service.

20. Windy Thompson, Mother's homebased caseworker from Lifeline, attempted to help mother create a budget and find housing.

21. Mother had outstanding utilities and would not stick with a budget. Mother bought fast food with her paycheck instead of paying her necessary living expenses. Windy attempted to get [Mother] to put her needs over her wants. Mother refused to tell Windy what she spent her money on so Windy was never sure where [Mother's] money was going.

22. Mother had prior evictions so it was difficult to find section 8 housing. Mother did receive a voucher to use and even had an extension. However, that voucher expired before [Mother] could find housing.

\* \* \* \* \*

25. Mother was not consistent with visitation. Visits originally started as three times a week. Due to [Mother's] inconsistency visits were dropped down to twice a week.

26. Stacy O'Neal, from Centerstone, provided visitation between [Mother] and child from August 2018 until the time of this hearing.

27. Visits originally started as three times a week for three hours, then went down to twice a week and now visits are once a week for two hours.

28. Due to [Mother's] inconsistency she is only doing two visits a month with the child.

29. The visits started off well. Mother was appropriate, kissing the child, and changing her diaper.

30. The visitation supervisor had concerns with Mother providing care for the child's medical needs.

31. Mother took a lot of prompting to do [M.R.'s] exercises with her. When she would do the exercises she would rush through them.

32. Mother is not consistent with visitation. Stacy could have closed [Mother] out on several occasions, however, Stacy has continued to give [Mother] multiple chances.

33. Stacy did not recommend unsupervised visits a[t] the time of the trial. Mother has housing but there are people coming in and out that she does not know. Stacy was also worried because [Mother] still requires a lot of prompting.

* * * * *

35. Mother completed her clinical assessment and psychological evaluation with Park Center on June 27, 2019.

36. The psychological evaluation also included a substance abuse evaluation and a parenting evaluation which was completed by Dr. Courtney Washington.

37. Dr. Washington is a Doctoral level Psychologist and was licensed in September 2018.

* * * * *

40. During the evaluation Mother was engaged and put in moderate effort. However, she struggled to maintain her feelings. She was loud, frustrated by the amount of time the evaluation was taking, had a lack of patience, appeared to be lower functioning, and was distracted by her phone. Mother continued to answer her phone and respond to text throughout the evaluation.

* * * * *

42. Mother presented with an IQ [of] 56, which [is] in the lower extreme. Mother's verbal score was 69 and her nonverbal score was 54. Based on those results, [Mother] does present with deficits in intellectual functioning.

43. The substance abuse assessment suggest a high probability that [Mother] has moderate to severe substance abuse problems.

44. Many of the parenting assessments conducted were invalid due to either defensiveness, inconsistency, or an attempt to present herself in a more favorable light. Of special note is [Mother's] limited level of empathy for the child. . . .

45. Dr. Washington recommended that [Mother] engage in individual therapy and medication management, which should be consistent in order to maintain her level of functioning. Based on the assessment provided, it is likely that [Mother] will struggle with managing her parenting responsibilities, especially parenting responsibilities associated with a severely physically ill child and the stress and financial means necessary in order to care for this child. Dr. Washington recommended parenting classes to develop greater skills sets and knowledge about parenting and developmental expectations. Finally, Dr. Washington recommended that [Mother] remain involved in the child's life

and remain [in] contact with the child regularly as long as she engages and participates in services.

46. Mother has a long history of not staying consistent with her medication. She struggles to keep on that which shows her inability to manage important things in her life.

47. . . . Mother was inconsistent with therapy and it went from one time a week for one hour to [Mother] only doing an appointment approximately twice a month.

48. Kristi Fierce, from Centerstone, is providing Mother with therapy.

49. Mother's therapy was prescribed for one hour a week, however, Mother only attended appointments approximately twice a month.

50. It took some time for the therapist to build trust and for Mother to make progress on her therapy. The therapist worked on developmental delays, life skills and trying to convince [Mother] to go back on her Medicaid waiver. However, [Mother] doesn't believe she needs help.

51. Kristi doesn't believe that [Mother] can care for the child without help for the child's regular daily needs, and the child's medical issues present even more significant issues. Mother is not receptive to that help.

52. Mother has never had consistent and stable housing. Mother was staying with friends, ex-husband, etc. Mother finally obtained housing in November 2019.

* * * * *

55. Marissa Barnett, from IU Children's Riley, worked with [M.R.] on speech and feeding.

56. Marissa started working with [M.R.] in August 2018. Marissa would meet with [M.R.] for 45 minutes once a week.

57. When Marissa started working with [M.R.], she was seven (7) months old, but her developmental progress was evaluated as a three month old, which was a generous evaluation.

58. Marissa met with [M.R.] for a total of fifty-one (51) appointments. Of those fifty-one (51) appointments Mother only attended thirty[-]five (35) of them.

59. Marissa would work with [Mother] on how to care for [M.R.]. It was challenging for [Mother] to retain the information she was given.

60. There were times when Marissa would do certain exercises that she told [Mother] not to do because she wasn't trained. Mother would attempt to do those exercises anyway.

61. Marissa stopped working with [M.R.] because she needed more physical therapy before moving forward with speech and feeding.

62. Kel[l]i Smith, a physical therapist from IU Children's Riley, works with [M.R.] on physical therapy.

63. Kel[l]i started working with [M.R.] when she was only seven months old. At the time Kel[l]i started with [M.R.], [M.R.] was scoring as a three or four month old.

64. [M.R.] would meet with Kel[l]i once a week for 40-45 minutes.

65. Kel[l]i met with [M.R.] a total of fifty-five (55) to sixty (60) times. Of those fifty-five (55) to sixty (60) appointments, Mother only attended fourteen (14). When Mother would attend, she would leave early or ask to step outside.

66. Kel[l]i had to start working with [M.R.] on simple things like tummy time then progress from there. Kel[l]i would give the caregivers exercises to do between therapy appointments.

67. When Kel[l]i would demonstrate the exercises, [Mother] would not ask questions or ask for more guidance. Kel[l]i testified that if [Mother] had attended all of the appointments then it would have been easier for her to learn the exercises that [M.R.] needed to do. Kel[l]i also testified that more appointments would not have benefited [Mother] because she did not attend the appointments that were already scheduled.

68. [M.R.] will need continued long-term services. Those services could continue through kindergarten and beyond.

69. The Court Appointed Special Advocate, Tina Yoder (Tina), has been involved in the underlying CHINS case as a child home school visitor since the case opened in July 2018.

70. The reasons that lead to removal are likely not going to be fixed due to [Mother's] own mental health issues and [Mother's] lack of ability to care for the child and the child's special needs.

71. Tina believes that it is in [M.R.'s] best interest [] for the Court to terminate Mother's parental rights and [M.R.] to be adopted, and the Court so finds.

72. [M.R.] is entitled to permanency and her needs are paramount. . . .

Appellant's Appendix Volume II at 70-76. The court concluded there was a reasonable probability that the conditions which resulted in M.R.'s removal and continued placement outside the home will not be remedied, continuation of the parent-child relationship posed a threat to M.R.'s well-being, and termination of Mother's parental rights was in M.R.'s best interest.

### *Discussion*

In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence. Ind. Code § 31-37-14-2. We do not reweigh the evidence or determine the credibility of witnesses but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We confine our review to two steps: whether the evidence clearly and convincingly supports the

findings, and then whether the findings clearly and convincingly support the judgment. *Id*. We give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. *Id*. "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640. The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B).

[12] Mother argues that the trial court erred in determining a reasonable probability that the conditions resulting in the child's removal will not be remedied and the continuation of the parent-child relationship poses a threat to the well-being of the child.[3] She contends that she needed assistance throughout M.R.'s life and "[n]o consistent, stable effort by DCS was given or set-up for [her] to remedy her situation over the long-term." Appellant's Brief at 22. She argues FCM Davis testified that she was able to obtain housing and was progressing. Mother also asserts that she "needed help getting prescribed the correct medication for her mental health so that she could meet the requirements of DCS." *Id.* DCS contends the court did not err in finding a reasonable

---

[3] Mother also argues that the trial court erred in determining on two separate occasions the child has been adjudicated a child in need of services. DCS agrees it did not prove, or attempt to prove, that M.R. had been adjudicated a CHINS on two prior occasions, and we note the trial court did not address or conclude that M.R. had been adjudicated a child in need of services on two separate occasions. We also note that Ind. Code § 31-35-2-4(b)(2)(B) is written in the disjunctive.

probability that Mother would not remedy the causes for the child's initial removal and the child's ongoing placement outside of her home.

[13]     In determining whether the conditions that resulted in a child's removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's drug abuse, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id.* Where there are only temporary improvements and the pattern of conduct shows no overall progress,

the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[14] Mother does not specifically challenge the trial court's findings including that she did not complete homebased casework; was inconsistent with visitation; visits were reduced due to her inconsistency; the visitation supervisor had concerns with her providing care for M.R.'s medical needs; she has a long history of not staying consistent with her medication; she was inconsistent with therapy; M.R. will need continued long-term services; and Mother's therapist did not believe that she could care for M.R. without help for M.R.'s regular daily needs. Mother also does not challenge the court's findings that if she participated in the Medicaid waiver she would have access to more intensive services, the therapist attempted to convince her to go back on her Medicaid waiver, and she did not believe she needed help and would not participate in the waiver. To the extent Mother does not challenge the court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[15] We note that Fierce, Mother's therapist, testified that Mother "can barely manage on her own." Transcript Volume II at 55. We also note that the following exchange occurred during the direct examination of CASA Yoder:

> Q. At this time, do you think the reasons that lead to the CHINS case are likely to be fixed?
>
> A. I do not.

Q. And what is that based on?

A. It's based on [Mother's] mental health, based on her resistance to listen to authority figures or to follow instructions from professionals, and also her inconsistency in visits, and also not only being inconsistent in needing the visits but ending them earlier, abruptly for different reasons.

*Id.* at 99-100.

[16] In light of the unchallenged findings and evidence set forth above and in the record, we cannot say the trial court clearly erred in finding that a reasonable probability exists that the conditions resulting in M.R.'s removal or the reasons for placement outside Mother's care will not be remedied.

[17] While Mother does not specifically challenge the trial court's finding that termination of the parent-child relationship is in the best interests of M.R., we note that in determining the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). The court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in a child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[18] When asked for her "recommendation for the best interest" of M.R., CASA Yoder answered: "My recommendation is that the parental rights be terminated and that [M.R.] be adopted . . . ." Transcript Volume II at 100. Based on the totality of the evidence, we conclude the trial court's determination that termination is in the child's best interests is supported by clear and convincing evidence.

[19] For the foregoing reasons, we affirm the trial court.

[20] Affirmed.

Robb, J., and Crone, J., concur.